UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT C. WATSON, SR.,

                              Plaintiff,

         -v-

WILLIAM GRADY, Dutchess County District
Attorney, EDWARD WHITESELL, Deputy District
Attorney, Dutchess County District Attorney,
THOMAS DiNAPOLI, Comptroller, State of New
York, BETH SIMS, ESQ., JEFFREY BAKER,
BOARD OF EDUCATION OF THE CITY OF
POUGHKEEPSIE SCHOOL DISTRICT,

                              Defendants.

No. 09-CV-3055 (KMK)

OPINION AND ORDER

Appearances:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

David L. Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendants Grady and Whitesell*

Steven L. Bank, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant DiNapoli*

Paul G. Ferrara, Esq.
Costello, Cooney & Fearon
Syracuse, NY
*Counsel for Defendant Sims*

Adam L. Rodd, Esq.
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd, PLLC
New Windsor, NY
*Counsel for Defendant Baker*

Claudia A. Ryan, Esq.
John F. Moore, Esq.
Towne, Ryan & Partners, P.C.
Albany, NY
*Counsel for Defendant Board of Education of the City of Poughkeepsie School District*

KENNETH M. KARAS, District Judge:

Plaintiff Robert C. Watson, Sr. ("Plaintiff") brings this action pursuant to 42 U.S.C. §

1983 ("§ 1983") against District Attorney William Grady ("Grady"), Deputy District Attorney

Edward Whitesell ("Whitesell"), Comptroller Thomas DiNapoli ("DiNapoli"), Beth Sims, Esq.

("Sims"), Jeffery Baker ("Baker"), and the Board of Education of the City of Poughkeepsie

School District ("the Board") (collectively, "Defendants"), asserting violations of his Fourth and

Fourteenth Amendment rights.  Defendants filed Motions to Dismiss pursuant to Fed. R. Civ. P.

12(b)(6) seeking to dismiss all of Plaintiff's claims.  For the reasons stated herein, the motions

are granted in part and denied in part.

## I.  Background

For the purposes of deciding the instant Motions to Dismiss, the Court accepts the

allegations in the Amended Complaint ("Am. Compl.") as true.

### A.  Factual Background

Starting on July 14, 2000, Plaintiff worked as the Superintendent of Schools for the City

of Poughkeepsie School District ("the District").  (Am. Compl. ¶ 10.)  In August 2001, the

Defendant Board appointed the law firm of Shaw & Perelson as counsel for the District, and, at

Plaintiff's request, Defendant Sims began working as day-to-day counsel for the District.  (*Id.* ¶¶

11-12.)

Defendant Baker, the business manager of the District, "harbored an intense animosity

toward [P]laintiff," especially after Plaintiff suspended Defendant Baker for insubordination in

2

the spring of 2005.  (*Id.* ¶¶ 15-16.)  In retaliation, Defendant Baker allegedly fabricated numerous records "chronicling . . . improprieties" by Plaintiff.  (*Id.* ¶¶ 17-18.)  In the summer of 2005, Defendant Baker tried to speak to the Defendant Board about Plaintiff, but the Defendant Board refused his request because it was aware of his animosity toward Plaintiff.  (*Id.* ¶¶ 19-20.)  Instead, the Defendant Board hired a consulting firm and launched an investigation into Plaintiff's allegations of improprieties by the business office.  (*Id.* ¶ 21.)  However, in an attempt to distract the Defendant Board from his own wrongdoings, Defendant Baker re-focused the investigation on Plaintiff.  (*Id.* ¶ 22.)

In the fall of 2005, after completion of a major construction project, the manager of the construction company, the Palumbo Group ("Palumbo"), informed Plaintiff and the Defendant Board that, because of extras in the project, the District owed Palumbo an additional $264,000.  (*Id.* ¶¶ 36-38.)  Plaintiff allegedly insisted that Palumbo provide "written justification" for the expenditures, advised Defendant Sims of the situation, and sought Defendant Sims' legal advice.  (*Id.* ¶¶ 39-40.)  After Palumbo provided the written justification, Plaintiff submitted the documents to Defendant Sims.  (*Id.* ¶ 41.)  The Defendant Board delayed deciding on the payment so that Defendant Sims could properly review the matter.  (*Id.* ¶ 42.)  Plaintiff conducted his own review of the expense documentation and eliminated $40,000 at his own discretion.  (*Id.* ¶ 43.)  When the Defendant Board voted on Palumbo's payment request, it approved the amount suggested by Plaintiff.  (*Id.* ¶ 44.)  Defendant Sims had still not reviewed the submission, despite having adequate time to do so, and did not provide any legal justification for denying the payment to Palumbo.  (*Id.* ¶¶ 45-46.)

After the Defendant Board approved the payment, Defendant Baker's office wrote a check to Palumbo that exceeded the amount approved by the Defendant Board.  (*Id.* ¶ 50.)  Even

though Defendant Baker supposedly noticed the discrepancy, he immediately sent the check to Palumbo, bypassing the standard review by the Internal Claims Auditor.  (*Id.* ¶¶ 51-52.) Defendant Baker's action was allegedly part of a scheme to frame Plaintiff because he knew that Plaintiff's secretary had inadvertently caused the error.  (*Id.* ¶¶ 52-53.)  According to Plaintiff, Defendant Baker mistakenly believed that the son of Plaintiff's secretary worked for Palumbo and that, as a result, Defendant Baker could claim that Plaintiff's secretary overstated the check, with Plaintiff's knowledge, in order to benefit her son.  (*Id.* ¶ 54.)  Plaintiff claims that he did not know about the incorrect check.  (*Id.* ¶ 55.)

In September 2005, the Defendant Board sought to end Plaintiff's employment because he had expressed to the Defendant Board that it was micro-managing him and engaging in racial discrimination by refusing his personnel recommendations.  (*Id.* ¶¶ 24-26.)  In October 2005, Defendant Sims met with Defendant Baker, knowing of his dislike for Plaintiff, in order to determine what information he had that might allow the Defendant Board to dismiss Plaintiff. (*Id.* ¶ 27.)  However, Defendant Baker did not cooperate with Defendant Sims at this time.  (*Id.* ¶ 28.)

Upon completion of the consulting firm's investigation, the Defendant Board was unable to use information against Plaintiff to begin a termination proceeding.  (*Id.* ¶ 29.)  Knowing that the allegations against Plaintiff were inaccurate, the Defendant Board presented Plaintiff with a severance agreement in November 2005, which set Plaintiff's final day as Superintendent as February 9, 2006.  (*Id.* ¶¶ 13, 23.)  A few days after the severance agreement was signed, a member of the Defendant Board spoke with Defendant Grady about the District Attorney's Office launching an investigation into Plaintiff's actions in order to provide the Defendant Board with a reason for "abrogat[ing]" the severance agreement.  (*Id.* ¶ 35.)  The severance agreement

later became controversial, and the Defendant Board was publicly criticized.  (*Id.* ¶¶ 14, 32, 57.)

Because of the controversy, which highlighted the financial problems of the District, Defendant

Sims proposed an audit of past dealings between Plaintiff and the Defendant Board.  (*Id.* ¶¶ 30,

33.)

Defendant Baker, allegedly seeing an opportunity to falsely attack Plaintiff, met with

Defendants Grady and Whitesell in December 2005 and presented purportedly false allegations

of fraud and deceit by Plaintiff.  (*Id.* ¶¶ 34, 58-59.)  Defendant Baker told Defendants Grady and

Whitesell that Plaintiff had defrauded the Defendant Board on behalf of Palumbo, and that

Palumbo had given Plaintiff money, which he used to buy a BMW.  (*Id.* ¶ 60.)  As proof,

Defendant Baker cited the erroneous check paid to Palumbo, even though he knew that Palumbo

had already returned the excess money.  (*Id.* ¶¶ 61-62.)  Defendant Baker, with the support of

Defendant Sims and members of the Defendant Board, also falsely claimed that Plaintiff had

coerced the Defendant Board into approving Palumbo's payment request by misrepresenting that

Gary McGrath ("McGrath"), the District's Director of Buildings and Grounds, had reviewed and

approved the payment.  (*Id.* ¶¶ 47, 63.)  But, Defendant Baker was not present at the relevant

board meeting, and Plaintiff claims that he never made such a representation to the Defendant

Board.  (*Id.* ¶¶ 49, 64.)

Defendants Grady and Whitesell began an investigation of these false accusations in

order to deflect public attention away from the Defendant Board.  (*Id.* ¶ 66.)  While interviewing

witnesses and "review[ing] [] potential evidence during the early stages of their investigation,"

Defendants Grady and Whitesell "understood that [Plaintiff] had not committed any criminal

offense," but decided to institute the prosecution based on "false, malicious[,] and misleading

statements made by" the other Defendants.  (*Id.* ¶ 74.)  Defendants Grady and Whitesell

5

allegedly "discount[ed] and hid[] evidence" that exonerated Plaintiff and showed that the Defendant Board was also responsible for the various decisions. (*Id.* ¶ 67.) Specifically, "in their effort to maliciously prosecute" Plaintiff, Defendants Grady and Whitesell ignored "facts made known to them during their investigation," including evidence that: (i) allegedly "corrupt sidebar agreements" were presented to the Defendant Board's lawyers and approved by the Defendant Board; (ii) Plaintiff had the authority to hire his secretary's fiancé and offer him credit for years worked outside the District; (iii) District employees, and not Plaintiff, had granted Plaintiff a pay raise at a rate consistent with past policies and the Defendant Board had accepted Plaintiff's salary raise; (iv) the Defendant Board approved Plaintiff's decision to pay an administrator's retirement incentive; (v) Plaintiff did not sign interview documents regarding four administrators, even though Defendants Whitesell and Grady claimed that Plaintiff falsified these records; (vi) the Defendant Board approved the hiring of those four administrators; and (vii) Plaintiff did not gain personal benefit from any of the alleged acts. (*Id.* ¶ 72.)

Nearly all of the information on which the prosecution was based came from Defendant Baker's false allegations. (*Id.* ¶ 73.) However, Defendant Sims also allegedly provided false information to Defendants Grady and Whitesell, falsely stating that Plaintiff had not timely reported the Palumbo incident to her and that she did not have sufficient time to review Palumbo's expense documentation. (*Id.* ¶ 75.) Defendants Grady and Whitesell relied on this information from Defendant Sims, disregarding her billing records. (*Id.* ¶ 78.) Defendant Sims also falsely claimed that Plaintiff had represented to the Defendant Board that Mr. McGrath had reviewed and approved Palumbo's expenses. (*Id.* ¶ 75.) Although Defendant Sims truthfully stated that she and the Defendant Board were aware of the sidebar agreements and that Plaintiff was acting within his authority as District Superintendent, Defendants Grady and Whitesell

"chose to ignore such information and, instead, to indict [P]laintiff." (*Id.* ¶¶ 79-80.)

Defendant DiNapoli, acting as the New York State Comptroller, "caused his staff to continue audits of school districts initiated by his predecessor." (*Id.* ¶¶ 4, 81.) Defendant DiNapoli allegedly "re-directed the audit of the . . . District to focus upon [P]laintiff" after "the outbreak of controversy . . . concerning [P]laintiff's severance agreement" and after he was pressured by Defendants Grady, Whitesell, and members of the Defendant Board. (*Id.* ¶¶ 82-83.) Plaintiff claims that the audit staff members "were predisposed to make [findings] adverse to [P]laintiff and [to] ignore[] evidence [that Plaintiff] directly presented to them showing that he had not engaged in improper practices and that others had engaged in substantial corrupt practices." (*Id.* ¶ 85.) According to Plaintiff, Defendant DiNapoli and his agents also "relied extensively" on Defendant Baker's fabricated allegations, despite having information from Plaintiff that refuted these allegations. (*Id.* ¶¶ 98-100.) On August 15, 2007, Defendant DiNapoli publicized the audit results, stating at a news conference that Plaintiff had "bent, twisted[,] and broke[n] the rules to make improper payments to himself and others," and that "[t]he improperties of one individual put more than $1 million of taxpayers['] money in jeopardy." (*Id.* ¶¶ 86-88.) After the audit findings were released, Defendant Grady publicly stated that audit staff members had testified before the Grand Jury and that Defendant DiNapoli "had been extremely cooperative in his ongoing investigation." (*Id.* ¶¶ 90-91 (internal quotation marks omitted).)

On February 7, 2008, Plaintiff was indicted by a Grand Jury on six felony counts and one misdemeanor count, charges which Plaintiff claims were based on the false Grand Jury testimony of Defendants Sims and Baker, members of the Defendant Board, and an agent of Defendant DiNapoli. (*Id.* ¶ 111.) The same day, Plaintiff alleges, Defendant Grady wrongly

announced at a press conference that "on several occasions [] [Plaintiff]'s alleged illegal conduct took place without the knowledge or approval of the [Defendant] [B]oard," and that "there was only reason to charge [Plaintiff]." (*Id.* ¶ 69 (internal quotation marks omitted).) Plaintiff was ultimately exonerated of all charges after a trial on the merits. (*Id.* ¶ 113.) According to Plaintiff, each Defendant acted to further his or her own career, despite knowing the falsity of the allegations and that the Defendant Board had approved many of Plaintiff's decisions. (*Id.* ¶¶ 109-10.)

### B.  Procedural Background

Plaintiff filed his initial Complaint on March 30, 2009 (Dkt. No. 1), and an Amended Complaint on June 29, 2009, (Dkt. No. 22). Defendants filed their Motions to Dismiss on September 15, 2009, and the motion was fully submitted on October 20, 2009, (Dkt. Nos. 28, 34, 36, 37, 38, 43).

## II.  Discussion

### A.  Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v.*

8

*Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted) (second alteration in original). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (internal citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original)).

B.  Section 1983 Malicious Prosecution Claims

Plaintiff alleges, pursuant to § 1983, that Defendants Baker, Sims, DiNapoli, and the Board violated his constitutional rights by maliciously prosecuting him.  (Am. Compl. ¶ 119.)[1]

_____

[1] As an initial matter, although Plaintiff characterizes his malicious prosecution claims as violations of the Fourteenth Amendment Due Process Clause, such claims are cognizable only under the Fourth Amendment's guarantees against unlawful seizure, as applied to the state

To assert a § 1983 claim, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law." *See Landon v. County of Orange*, No. 08-CV-8048, 2009 WL 2191335, at *4 (S.D.N.Y. July 23, 2009). Malicious prosecution claims brought pursuant to § 1983 are generally governed by state law. *Id.*; *see also Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 226 (S.D.N.Y. 2010) ("A § 1983 claim for malicious prosecution requires the plaintiff to 'demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty.'" (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003))). To state a claim for malicious prosecution under New York law, a plaintiff must sufficiently allege that: (1) "the defendant initiated a criminal proceeding" against plaintiff; (2) "the proceeding . . . terminated favorably to plaintiff;" (3) "there was no probable cause for the criminal charge;" and (4) "the defendant acted maliciously." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004); *see also Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (same). Here, the second element, that the criminal proceeding terminated in Plaintiff's favor, is undisputed, as he was acquitted of all charges after a bench trial.

---

through the Fourteenth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 274-75 (1994) (plurality opinion) (noting that a claim to be free from prosecution except based on probable cause was cognizable under the Fourth Amendment, but not under the Fourteenth Amendment's substantive due process guarantees); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) ("[T]he Fourth Amendment is the proper source of constitutional protection for claims, such as malicious prosecution, that implicate a person's liberty interest in respect of criminal prosecutions . . . ."). Indeed, Plaintiff acknowledges this apparent pleading error. (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Mem.") 45-46.) Considering that Defendants address Plaintiff's malicious prosecution claims on the merits as Fourth Amendment claims, the Court is willing, as Plaintiff requests, to construe his claims as alleging Fourth Amendment violations. (*Id.*); *see Landon v. County of Orange*, No. 08-CV-8048, 2009 WL 2191335, at *4 (S.D.N.Y. July 23, 2009) (analyzing plaintiff's complaint "to determine whether it states a claim for malicious prosecution pursuant to the Fourth Amendment" when the plaintiff alleged that his "liberty interests and Fourteenth Amendment right to due process of law" were violated by his arraignment).

1.  Defendant Baker

Defendant Baker argues that Plaintiff has failed to satisfy the first element of a malicious prosecution claim because he has not sufficiently alleged that Defendant Baker initiated the prosecution.  (Def. Baker's Mem. of Law in Supp. of Mot. ("Baker Mem.") 7-9.)  The Second Circuit has held that "reporting a crime to law enforcement and giving testimony does not constitute the 'initiation' of a criminal prosecution."  *Rothstein*, 373 F.3d at 293; *see also Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (same).  Rather, the defendant must have played an "'active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'"  *Rohman*, 215 F.3d at 217 (quoting *DeFilippo v. County of Nassau*, 583 N.Y.S.2d 283, 284 (App. Div. 1992)).  A defendant may be said to commence or continue a prosecution if that defendant knowingly provides false information or fabricated evidence that is likely to influence the prosecutors or the grand jury.  *See Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07-CV-5441, 2009 WL 817852, at *3 (E.D.N.Y. Mar. 27, 2009) ("Giving information to the police that is known to be false qualifies as the commencement of a prosecution."); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 272 (E.D.N.Y. 2000) (noting that civilian witnesses may be liable for malicious prosecution "if the information they falsely gave the prosecutor induced the prosecutor to act" or if they "conspire[d] with a complaining witness to manufacture evidence that is likely to influence the prosecutor's decision to commence proceedings"); *Babi-Ali v. City of New York*, 979 F. Supp. 268, 276 (S.D.N.Y. 1997) (noting that a defendant may commence or continue a prosecution if he provided "information which he knew to be false and so unduly influenced the authorities" (internal quotation marks omitted)).

11

Here, although Defendant Baker repeatedly argues that Plaintiff's allegations are "unspecified" (Baker Mem. 4, 6), the Amended Complaint alleges that Defendant Baker falsely informed Defendants Grady and Whitesell that Plaintiff "was engaged in a corrupt scheme to defraud the [] Board on behalf of the Palumbo Group, [and] that [Plaintiff] had been paid off by this business and purchased a late model BMW with [the] funds." (Am. Compl. ¶¶ 59-60.) Plaintiff also alleges that Defendant Baker gave the prosecutors the Palumbo check, despite supposedly knowing that Palumbo had paid back the extra money. (*Id.* ¶¶ 61-62.) Plaintiff further alleges that Defendant Baker lied to Defendants Grady and Whitesell, stating that Plaintiff "had caused the [D]efendant Board [] to approve the payment to Palumbo" by claiming that Mr. McGrath "had reviewed and approved the payment." (*Id.* ¶¶ 63-65.) Finally, Plaintiff alleges that Defendant Baker presented other false claims about Plaintiff to the prosecutors (*id.* ¶ 59), that "[n]early all [of] the information which predicated the prosecution . . . came from [D]efendant Baker" (*id.* ¶ 73), and that Plaintiff was indicted based, in part, on Defendant Baker's false Grand Jury testimony, (*id.* ¶ 111).

Accepting these facts as true, as the Court must at this stage of the litigation, Plaintiff has alleged that Defendant Baker did more than passively alert the prosecutors of possible criminal activity. To the contrary, Plaintiff has alleged specific facts plausibly suggesting that Defendant Baker commenced or continued the prosecution against Plaintiff by knowingly presenting false or misleading information to the prosecutors and by testifying falsely before the Grand Jury. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (reversing summary judgment because "a jury could find that [the defendant] played a role in initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors"); *Rivers*, 2009 WL 817852, at *3 (denying defendant company's motion to dismiss when the complaint sufficiently

alleged that it had commenced the criminal proceeding by falsely claiming that the plaintiff stole computers); *Jovanovic v. City of New York*, No. 04-CV-8437, 2006 WL 2411541, at *9 (S.D.N.Y. Aug. 17, 2006) (finding that the plaintiff sufficiently alleged that the defendant officer commenced or continued the prosecution by claiming that he had created and forwarded false information to the prosecutors and supplied false testimony to the grand jury), *reconsidered on other grounds*, 2008 WL 355515 (S.D.N.Y. Feb. 7, 2008).

The Court is also not persuaded by Defendant Baker's argument that Plaintiff has failed to state a claim because he does not sufficiently allege that Defendant Baker provided false information or testimony that "contributed to the bringing of the criminal charges." (Baker Mem. 13.) Specifically, Defendant Baker argues that the Amended Complaint fails to allege that Defendant Baker provided any false information or testimony regarding counts two through seven of the indictment. (Baker Mem. 12.)[2] Defendant Baker further argues that because the first count of the indictment alleges, inter alia, that Plaintiff should not have recommended that the Board pay Palumbo's original invoice, Plaintiff's claim that Defendant Baker provided false information related to the erroneous Palumbo check was immaterial to the prosecution. (*Id.* 12-13.)[3] These arguments fail. First, although Plaintiff cites the erroneous check as one example of

---

[2] Count two of the indictment charged plaintiff with grand larceny for allegedly submitting and receiving improper and unauthorized payments for unused vacation days, days he did not work, meal vouchers, personal time, and salary increases. Counts three through six charged plaintiff with offering a false instrument for filing for allegedly submitting false statements regarding his interview process for applicants to the school. Count seven charged plaintiff with payment of an unqualified teacher. (Decl. of Adam L. Rodd in Supp. of Mot. ("Rodd Decl.") Ex. C, at 1-4; *id.* Ex. D, at 7-14.)

[3] Because the indictment and bill of particulars are state court documents, the Court will take judicial notice of these documents to determine what statements they contain, but not for the truth of the matters asserted. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (noting that the court may take judicial notice of court documents); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (noting that, in the motion to dismiss context, the court should generally

the allegedly false information Defendant Baker provided the prosecutors, Plaintiff also alleges that Defendant Baker "began an extensive process of presenting fabricated and unsupportable claims against [Plaintiff]" to the prosecutors, including a claim that Plaintiff "was engaged in a corrupt scheme to defraud the [Defendant] Board on behalf of [] Palumbo" and was "paid off" by Palumbo.  (Am. Compl. ¶¶ 59-60.)  Moreover, Plaintiff specifically alleges that Defendant Baker lied to the prosecutors regarding Plaintiff's representations to the Defendant Board about Mr. McGrath reviewing the Palumbo charges in order to induce the Defendant Board into approving the payment to Palumbo.  (Am. Compl. ¶¶ 63-65.)  It is difficult to see how Plaintiff has not plausibly connected this falsehood to Plaintiff's prosecution for the first count of the indictment when the bill of particulars specifically alleges that Plaintiff misrepresented to the Defendant Board that the Director of Facilities (Mr. McGrath) had "reviewed and approved" the documentation in order to convince the Defendant Board to approve the payment.  (Rodd Decl. Ex. D, at 6.)

Second, because Plaintiff alleges that Defendant Baker provided false information about Plaintiff's relationship with Palumbo, including the incident involving the excessive check, it is plausible that these falsehoods affected Defendants Grady and Whitesell's decision to investigate and prosecute Plaintiff, at least with regard to the Palumbo payment.  *See Rivers*, 2009 WL 817852, at *3 (finding that allegation that defendant "intentionally, falsely and maliciously asserted that plaintiff had committed various crimes" was sufficient to state a malicious prosecution claim (internal quotation marks omitted)); *see also Mejia*, 119 F. Supp. 2d at 256 (denying summary judgment because the "indictment was obtained against [the plaintiff] based

take judicial notice "to determine what statements [the documents] contain[] . . . not for the truth of the matters asserted").

on the defendants' alleged misrepresentations regarding the exchange of calls between" the

plaintiff and a package delivery service).  Indeed, Plaintiff alleges that "[n]early all [of] the

information which predicated" his prosecution "came from [D]efendant Baker."  (Am. Compl.

¶73.)  Based on these allegations, the Court cannot decide that, as a matter of law, Defendant

Baker's alleged falsehoods did not unduly influence the prosecutors to act.  *See Lupski v. County

of Nassau*, 822 N.Y.S.2d 112, 114 (App. Div. 2006) (noting that to be liable for initiating a

prosecution, a "defendant must have affirmatively induced the officer to act, such as . . . showing

active, officious and undue zeal," and knowingly providing false information); *see also Palmer

v. Monroe Cnty. Deputy Sheriff*, No. 00-CV-6370, 2004 WL 941784, at *4 (W.D.N.Y. Apr. 29,

2004) (finding that the plaintiff raised a genuine issue of material fact regarding "whether or not

the information provided by the defendants to investigators unduly influenced law enforcement

officials" when the evidence suggested that law enforcement focused their attention solely on

plaintiff and did not verify the defendants' information).

        Similarly, Defendant Baker's argument that his Grand Jury testimony is protected by

absolute immunity is to no avail.  (Baker Mem. 9); *see San Filippo v. U.S. Trust Co. of N.Y.*, 737

F.2d 246, 254 (2d Cir. 1984) (noting that a witness may not be sued for presenting false trial or

grand jury testimony).  The Second Circuit has rejected such a blanket argument, drawing a

distinction between witnesses "whose role was limited to providing testimony," who enjoy

immunity, and complaining witnesses, who "played a role in initiating a prosecution" and who,

therefore, do not enjoy immunity.  *White v. Frank*, 855 F.2d 956, 958-59, 961 (2d Cir. 1988)

(noting that this distinction, rooted in common law, reflects the difference between a defamation

claim, in which a witness is sued for false testimony, and a malicious prosecution claim, in

which the witness is sued "for his role in *initiating* a baseless prosecution" (emphasis in

15

original)); *see also Mejia*, 119 F. Supp. 2d at 272 (noting that "the availability of immunity [for grand jury testimony] turns on whether the individual was a complaining witness" and that a complaining witness, "be they private citizens or police officers . . . are not entitled to absolute immunity" if they testify falsely).  Here, for the reasons already explained, Plaintiff has sufficiently alleged that Defendant Baker played a role in initiating the prosecution.  As a result, Defendant Baker's grand jury testimony does not make him immune from a malicious prosecution suit.  *See Manganiello v. City of New York*, No. 07-CV-3644, 2008 WL 2358922, at *8 (S.D.N.Y. June 10, 2008) (declining to find that the defendants were entitled to absolute immunity for their testimony when the "gravamen of [p]laintiff's lawsuit [wa]s that [d]efendants were 'complaining witnesses,' *i.e.*, that they instigated or encouraged a malicious prosecution against him"); *Mejia*, 119 F. Supp. 2d at 272 (finding that grand jury witness was not immune from malicious prosecution claim, noting that whether a defendant is a complaining witness is a fact-specific inquiry).  Accordingly, Defendant Baker's Motion to Dismiss the malicious prosecution claim is denied.

### 2.  Defendant Sims

Defendant Sims first argues that Plaintiff has failed to sufficiently allege that she acted under color of state law.  (Def. Beth Sims, Esq., Mem. of Law in Supp. of Her Mot. to Dismiss ("Sims Mem.") 6-7.)  As Plaintiff concedes, Defendant Sims cannot be held liable pursuant to § 1983 as a state actor simply because she was hired as a private attorney for the District.  (Pl.'s Mem. 41); *see Licari v. Voog*, 374 F. App'x 230, 231 (2d Cir. 2010) (summary order) ("It is well established that private attorneys--even if the attorney was court appointed--are not state actors for the purposes of § 1983 claims."); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 319 (S.D.N.Y. 2008) ("[A] private attorney representing a client in either a civil or criminal action is

16

not a state actor for purposes of § 1983." (internal quotation marks omitted)).  However, Plaintiff

may state a claim against Defendant Sims pursuant to § 1983 by "alleg[ing] facts demonstrating

that [she] acted in concert with the state actor to commit an unconstitutional act."  *Ciambriello v.

County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (internal quotation marks omitted).

Conclusory allegations that a private individual conspired or took concerted action with

state actors will not suffice.  *See id.* ("A merely conclusory allegation that a private entity acted

in concert with a state actor does not suffice to state a § 1983 claim against the private entity.");

*Johnson v. City of New York*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) (same).  Rather, a

plaintiff must allege "a sufficiently close nexus between the State and the challenged action of

the private party so that the action of the latter may be fairly treated as that of the State itself, or

[that] [the private actor] [was] jointly engaged with state officials in a conspiracy to deprive the

plaintiff of his constitutional rights."  *Bhatia v. Yale Sch. of Med.*, 347 F. App'x 663, 664-65 (2d

Cir. 2009) (summary order) (internal quotation marks, citations, and brackets omitted); *see also

Ciambriello*, 292 F.3d at 324 (noting that a plaintiff can state a claim by alleging that a private

actor was "a willful participant in joint activity with the State or its agents" (internal quotation

marks omitted)); *Johnson*, 669 F. Supp. 2d at 450 ("[A] plaintiff must allege that the private

entity and state actors carried out a deliberate, previously agreed upon plan, or that their activity

constituted a conspiracy or meeting of the minds." (internal quotation marks and brackets

omitted)).

Here, although Plaintiff's allegations are not a model of clarity, the Amended Complaint

asserts that Defendant Sims met with Defendant Baker in October 2005 "in an effort to

determine whether his information could predicate charges against [P]laintiff."  (Am. Compl. ¶

27.)  Defendant Baker refused to work with Defendant Sims at this time (*id.* ¶ 28), but Plaintiff

alleges that Defendant Baker later decided to work with the Defendant Board and its counsel, Defendant Sims, to frame allegations against Plaintiff.  (*Id.* ¶ 34.)  Plaintiff also alleges that Defendant Baker made false statements to the prosecutors about Plaintiff representing that Mr. McGrath had reviewed the Palumbo documentation "with the support of [D]efendant Sims" (*id.* ¶ 63), and that Defendant Sims made the same false accusation to Defendants Grady and Whitesell, (*id.* ¶ 75). Plaintiff further alleges that Defendants Grady and Whitesell ignored facts that would exonerate Plaintiff in order to protect the Defendant Board and Defendant Sims.  (*Id.* ¶ 72.)  Based on these allegations, Plaintiff has plausibly raised a claim that Defendant Sims was working in concert or conspiring with Defendant Baker and the Defendant Board, who are state actors, to maliciously prosecute Plaintiff.  *See Young v. Suffolk County*, 705 F. Supp. 2d 183, 198-99 (E.D.N.Y. 2010) (finding that the plaintiff had sufficiently alleged concerted action by asserting that private defendants, including an attorney, "provided the police with a false premise for the search . . . and accompanied the police on the alleged unlawful search"); *Friedman v. N.Y.C. Admin. for Children's Servs.*, No. 04-CV-3077, 2005 WL 2436219, at *8-9 (E.D.N.Y. Sept. 30, 2005) (denying private defendant's motion to dismiss when the plaintiff alleged that he had purposefully "provided [the government agency] with false and malicious information"); *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 624 (S.D.N.Y. 1999) (finding that the plaintiff had sufficiently alleged concerted state action for his malicious prosecution claim by alleging that the private defendants "wilfully caused [the] Assistant District Attorney[] to violate [the] plaintiffs' rights by manipulating the evidence presented to the Grand Jury"), *aff'd*, 234 F.3d 1261 (2d Cir. 2000).[4]

---

[4] The cases cited by Defendant Sims are not to the contrary.  In *R-Goshen LLC v. Village of Goshen*, 289 F. Supp. 2d 441 (S.D.N.Y. 2003), *aff'd*, 115 F. App'x 465 (2d Cir. 2004), the

Defendant Sims also argues that Plaintiff has failed to adequately allege that she initiated the prosecution against Plaintiff.  (Sims Mem. 10-11.)  As already discussed above in regard to the same argument made by Defendant Baker, Defendant Sims may be liable for initiating the prosecution if she provided false information to prosecutors that induced the prosecutors to act, or conspired with a complaining witness who falsely induced the prosecutors to act.  *See Ricciuti*, 124 F.3d at 130; *Jovanovic*, 2006 WL 2411541, at *9.  Plaintiff has alleged that Defendant Sims falsely told Defendants Grady and Whitesell that Plaintiff represented to the Defendant Board that Mr. McGrath had reviewed the Palumbo invoices, and that she supported Defendant Baker in making the same false allegation.  (Am. Compl. ¶¶ 63, 75.)  Moreover, Plaintiff alleges that Defendant Sims also falsely told the prosecutors that Plaintiff had not timely reported the Palumbo payments to her and that she "knowingly fabricated incriminating information about [Plaintiff] as part of her effort to cover her own involvement."  (*Id.* ¶¶ 73, 75.)  Accordingly, Plaintiff has alleged facts plausibly suggesting that Defendant Sims provided false information to the prosecutors that induced them to act.

Finally, Defendant Sims argues that even if Plaintiff sufficiently alleges that she initiated the prosecution, his claim fails because the Grand Jury determined that there was probable cause for the prosecution.  (Sims Mem. 11-12.)  "[T]he existence of probable cause is a complete

---

district court held that a private consultant could not be held liable as a state actor for providing his professional opinion and advice.  *Id.* at 445.  Similarly, the plaintiff in *Goetz v. Windsor Central School District*, 595 F. Supp. 526 (N.D.N.Y. 1984), failed to allege that a private attorney for a school district was a state actor when he only alleged that the attorney provided professional advice to the district, without having any "direct interest" in the matter.  *Id.* at 528-29.  In the instant matter, Plaintiff does not allege that Defendant Sims was a state actor because she provided her legal opinion to the District; rather, Plaintiff alleges that Defendant Sims worked with Defendant Baker and/or the Defendant Board to provide false information to the prosecutors in order to shift any blame away from herself and onto Plaintiff.

defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *see also Landon*, 2009 WL 2191335, at *8 (noting that a "[p]laintiff must plead facts sufficient to establish a lack of probable cause" to support a malicious prosecution claim). Although a grand jury indictment creates a presumption of probable cause, *see Savino*, 331 F.3d at 72, a plaintiff may rebut this presumption by showing "that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (internal quotation marks omitted); *see also Hamid v. Temple*, No. 05-CV-1358, 2009 WL 499136, at *11 (N.D.N.Y. Feb. 26, 2009) (noting that the presumption of probable cause can be overcome by showing "that the indictment was produced by fraud, perjury, the suppression of evidence or other conduct undertaken in bad faith" (internal quotation marks and ellipsis omitted)). Perjury by civilian witnesses is generally insufficient to overcome the probable cause presumption, unless there is some allegation "that the prosecuting authorities were complicit in the perjury." *Cabble v. City of New York*, No. 04-CV-9413, 2009 WL 890098, at *3 (S.D.N.Y. Mar. 30, 2009); *see also Jenkins v. City of New York*, Nos. 98-CV-7170, 98-CV-7338, 1999 WL 782509, at *9 (S.D.N.Y. Sept. 30, 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000) (noting that a civilian witness's "perjury must be attributable to the police" in order to overcome the presumption of probable cause).

As already discussed, Plaintiff alleges that Defendant Sims falsely told Defendants Grady and Whitesell that Plaintiff did not consult her in a timely manner regarding the Palumbo payment and that she did not have enough time to review Palumbo's documentation. (Am. Compl. ¶ 75.) Plaintiff also alleges that Defendant Sims falsely told the prosecutors that Plaintiff represented to the Defendant Board that Mr. McGrath approved the Palumbo payment (*id.*), and that Defendants Grady and Whitesell relied on this knowingly false information, (*id.* ¶

78).  Moreover, the Amended Complaint alleges that the indictment was based, in part, on the

false testimony of Defendant Sims.  (*Id.* ¶ 111.)  Finally, the Amended Complaint alleges that

the prosecutors knowingly presented this (and other) false testimony to the Grand Jury, knowing

that there was no reason to prosecute Plaintiff.  (*Id.* ¶ 74.)[5]  Based on these allegations, Plaintiff

has raised a plausible claim that the grand jury did not act judiciously and that the presumption

of probable cause can be overcome.  *See Cipolla v. County of Rensselaer*, 129 F. Supp. 2d 436,

453-55 (N.D.N.Y. 2001) (denying summary judgment on malicious prosecution claim when

there were disputed issues of fact regarding the presumption of probable cause because

numerous county officials and the prosecutors were alleged to have conspired to present false

testimony and evidence to the grand jury), *aff'd*, 20 F. App'x 84 (2d Cir. 2001); *see also Lupski*,

822 N.Y.S.2d. at 114 (noting that a civilian witness may be liable for malicious prosecution

despite a grand jury indictment if the plaintiff shows "that [the] defendant has not made a full

and complete statement of the facts either to the Grand Jury or the District Attorney, has

misrepresented or falsified the evidence or else kept back evidence which would affect the

result" (internal quotation marks omitted)).  Accordingly, Defendant Sims' Motion to Dismiss

the malicious prosecution claim is denied.

### 3.  The Defendant Board

The Defendant Board first argues that Plaintiff has failed to state a claim against it for

municipal liability.  (Def. Board's Mem. of Law in Supp. of Mot. to Dismiss Pl.'s Am. Compl.

---

[5] Although, as discussed *infra*, prosecutors are absolutely immune from liability for
allegations regarding the presentation of false testimony to the grand jury, such immunity does
not extend to those not acting in a prosecutorial role.  *See Scotto v. Almenas*, 143 F.3d 105, 114
(2d Cir. 1998) ("Even if the state actors are absolutely immune from suit, . . . private parties who
conspire with them may be held liable for damages.").

("Board Mem.") 7-8.)  Pursuant to the well-known dictates of *Monell*, to bring a § 1983 claim

against a municipality, including a Board of Education, a plaintiff must allege that the alleged

unconstitutional "acts were performed pursuant to a municipal policy or custom."  *Patterson v.*

*County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see also DiStiso v. Town of Wolcott*, No.

05-CV-1910, 2006 WL 3355174, at *8 (D. Conn. Nov. 17, 2006) ("Under *Monell*, a municipality

and/or a board of education can be held liable for an official policy that, when applied by an

employee, deprives a person of a constitutional right."); *see generally Monell v. Dep't of Soc.*

*Servs. of N.Y.C.*, 436 U.S. 658, 692-94 (1978).  "The Supreme Court has identified at least two

situations that constitute a municipal policy: (1) where there is an officially promulgated policy

as that term is generally understood (i.e., a formal act by the municipality's governing body), and

(2) where a single act is taken by a municipal employee who, as a matter of State law, has final

policymaking authority in the area in which the action was taken."  *Newton v. City of New York*,

566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469,

480-81 (1986) and *Monell*, 436 U.S. at 690) (internal footnote and emphasis omitted).  "A

municipal 'custom,' on the other hand, need not receive formal approval by the appropriate

decisionmaker . . . ."  *Id.*  Instead, "an act performed pursuant to a 'custom' that has not been

formally approved by an appropriate decisionmaker may fairly subject a municipality to liability

on the theory that the relevant practice is so widespread as to have the force of law."  *Bd. of the*

*Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

     Here, Plaintiff has not alleged any formal policy adopted by the Defendant Board or any

widespread custom that could subject it to *Monell* liability.  Instead, Plaintiff argues that various

Defendants or Board members' actions were sufficient to establish *Monell* liability.  (Pl.'s Mem.

35.)  To succeed on this theory, it is not enough for Plaintiff to allege that the municipal actors

had "been granted discretion in the performance of [their] duties;" rather, the Court looks to state law to determine whether the actors had final policymaking authority. *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000); *see also McDonald v. Bd. of Educ. of N.Y.C.*, No. 01-CV-1991, 2003 WL 21782685, at *3 (S.D.N.Y. July 31, 2003) ("Whether the official in question possessed final policymaking authority is a legal question to be answered on the basis of state law . . . ."). Plaintiff alleges misconduct by Defendant Sims and Defendant Baker, but there are no facts plausibly suggesting that the District's hired counsel or business manager had final policymaking authority for the Defendant Board.  However, Plaintiff also alleges that various Board members, individually or together, asked the prosecutors to launch an investigation into Plaintiff in order to provide "cover" for the severance agreement (Am. Compl. ¶ 35), and provided false statements to the prosecutors or condoned Defendant Baker's false statements, (*id.* ¶¶ 63, 74, 111-12).  Although the Amended Complaint is not entirely clear on the precise role of these board members, its allegations are sufficient, at this stage, to plausibly suggest *Monell* liability.[6]  *See Back v. Hasting on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004) (noting that a school board may have final policy making authority in certain areas and that a decision "by a person whose edicts or acts may fairly be said to represent official policy, can, by itself, support a claim against a municipality" (internal quotation marks omitted)); *Walton v. Safir*, 122 F. Supp. 2d 466, 478 (S.D.N.Y. 2000) (finding that municipality could be held liable under *Monell* for decisions "made at the highest level of the [police] [d]epartment").

---

[6] To be clear, it remains to be seen, with the benefit of discovery, whether any individual Board member, or even a group of Board members, can fairly be said to have final policymaking authority for the Defendant Board.

The Defendant Board, like the other Defendants, argues that Plaintiff has failed to plead facts suggesting that it initiated the prosecution.  (Board Mem. 3-5.)  However, as already discussed above, Plaintiff alleges that: (I) one Board member spoke with Defendant Grady about launching an investigation of Plaintiff to provide the Defendant Board "cover to abrogate the severance agreement" (Am. Compl. ¶ 35); (ii) members of the Defendant Board "support[ed]" Defendant Baker in making false statements to the prosecutors (*id.* ¶ 63); (iii) Board members made false statements to the prosecutors and testified falsely before the Grand Jury (*id.* ¶¶ 73-74, 110-12); and (iv) the Defendant Board "fail[ed] . . . to truthfully account for its conduct with regard to the matters under review," (*id.* ¶ 112).  These allegations at least plausibly suggest that the Defendant Board initiated the prosecution by requesting an investigation, providing, or conspiring to provide, false statements to the prosecutors and Grand Jury, and withholding exculpatory information.  *See Ricciuti*, 124 F.3d at 130; *TADCO Constr. Corp. v. Dormitory Auth. of N.Y.*, 700 F. Supp. 2d 253, 270 (E.D.N.Y. 2010) ("Giving information to the police that is known to be false qualifies as the commencement of a prosecution." (internal quotation marks omitted)); *Ramos v. City of New York*, 729 N.Y.S.2d 678, 690 (App. Div. 2001) (holding that city could be liable for initiating a prosecution if its agency provided information about alleged child abuse to prosecutors, but withheld exculpatory evidence in its possession).

Finally, the Defendant Board argues that Plaintiff failed to adequately plead that it acted with malice.  (Board Mem. 5-6.)  Malice may be pled by alleging "facts that show the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'"  *TADCO Constr.*, 700 F. Supp. 2d at 271 (quoting *Du Chateau v. Metro-N. Commuter R.R. Co.*, 688 N.Y.S.2d 12, 15 (App. Div. 1999)).  Here, Plaintiff alleges that the Defendant Board acted to advance its own self-interest and to

blame Plaintiff in order to provide "cover" for the severance agreement.  (Am. Compl. ¶¶ 35, 66,

109.)  Accepting these factual allegations as true, as the Court must here, Plaintiff has

sufficiently alleged malice.  *See TADCO Constr.*, 700 F. Supp. 2d at 271 (finding that the

plaintiff adequately pled malice by alleging that the defendant "maliciously commenced the

proceeding as a means of retaliating against him and gaining leverage in their disagreement");

*see also Doré v. Wormley*, 690 F. Supp. 2d 176, 187 (S.D.N.Y. 2010) (noting that malice

requires a showing that the defendant initiated the prosecution with "a purpose other than the

adjudication of a claim" (internal quotation marks omitted)).  Accordingly, the Defendant

Board's Motion to Dismiss the malicious prosecution claim is denied.[7]

### 4.  Defendant DiNapoli

Echoing the claims of other Defendants, DiNapoli argues that Plaintiff has failed to

sufficiently allege that he initiated the prosecution.  (Mem. of Law in Supp. of Def. Comptroller

DiNapoli's Mot. to Dismiss the Am. Compl. ("DiNapoli Mem.") 9-12.)  The Court agrees with

Defendant DiNapoli that Plaintiff's allegations regarding the actions of Defendant DiNapoli's

staff do not by themselves suffice to state a claim against him, particularly when Plaintiff has

failed to specify any dates or facts regarding what audit staff members did that was improper.  It

is well settled that supervisors are not liable pursuant to § 1983 based on a theory of respondeat

superior.  *See Iqbal*, 129 S. Ct. at 1948.  "The liability of a supervisor under § 1983 can be

shown in one or more of the following ways: (1) actual direct participation in the constitutional

---

[7] The Court notes that Plaintiff has conceded that he cannot seek punitive damages
against the Defendant Board because punitive damages are not available for suits against
municipalities.  (Pl.'s Mem. 71); *see Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)
(holding "that a municipality is immune from punitive damages" for § 1983 claims).  As a result,
the Defendant Board's Motion to Dismiss the punitive damages claims is granted.

violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3)

creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or

allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates

who committed a violation, or (5) failure to act on information indicating that unconstitutional

acts were occurring." *TADCO Constr.*, 700 F. Supp. 2d at 274 (internal quotation marks

omitted); *see also Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (same).

First, Plaintiff's allegations that "during the 2005-06 school year, [D]efendant DiNapoli

caused his staff to continue audits of school districts initiated by his predecessor" and "re-

directed the audit" towards Plaintiff  "[a]fter the outbreak of controversy . . . concerning

[P]laintiff's severance agreement" (Am. Compl. ¶¶ 81-83), which Plaintiff alleges occurred in

the Fall of 2005 (*id.* ¶¶ 13, 30), are implausible when Defendant DiNapoli undisputedly did not

take office as Comptroller until February 2007.  *See* The New York Red Book 639 (Edward

Neiles ed., 99th ed. 2007-08); *see also Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05-CV-7040,

2007 WL 2844939, at *2 n.2 (S.D.N.Y. Sept. 28, 2007) (noting that the court would take judicial

notice of "matters in the public record . . . such as election dates and results"); *Fink v. Weill*, No.

02-CV-10250, 2005 WL 2298224, at *5 n.9 (S.D.N.Y. Sept. 19, 2005) (taking "judicial notice of

the individuals elected to the 2003 [Citigroup] board of directors" "[b]ecause the composition of

[the] board of directors [wa]s public information not subject to reasonable dispute"); *see*

*generally* Fed. R. Evid. 201(b)(2) (stating that a court may take judicial notice of any fact "not

subject to reasonable dispute in that it is . . . capable of accurate and ready determination by

resort to sources whose accuracy cannot reasonably be questioned").  Moreover, the fact that the

audit was statutorily mandated further undermines Plaintiff's allegation that Defendant DiNapoli

participated in any constitutional violations by "continu[ing]" the audit.  *See* N.Y. Gen. Mun.

Law § 33(2)(a) (stating that "the comptroller shall cause the accounts of every school district . . . in the state to be examined pursuant to a plan developed by the comptroller" and that "every school district . . . shall be audited at least once by March [31, 2010]"); *see also Sadler v. Lantz*, No. 07-CV-1316, 2009 WL 3013716, at *8 (D. Conn. Sept. 16, 2009) (taking judicial notice of New York regulations and administrative directive), *reconsidered on other grounds*, 2010 WL 3418127 (D. Conn. Aug. 20, 2010); *United States v. Cook*, No. 07-CR-6195, 2008 WL 728883, at *5 (W.D.N.Y. Mar. 17, 2008) (taking judicial notice of the New York state penal code). Second, although Plaintiff alleges that an audit staff member testified falsely to the Grand Jury (Am. Compl. ¶ 111), there is no allegation that Defendant DiNapoli testified before the Grand Jury, created a policy or custom regarding false testimony, or was or should have been aware that audit staff members were testifying falsely.  Similarly, Plaintiff vaguely alleges that Defendant DiNapoli's staff was "predisposed to make determinations adverse to [P]laintiff and ignore[] evidence," without alleging that Defendant DiNapoli was, or should have been aware, of such supposed predispositions.  (Am. Compl. ¶ 85.)  As a result, there is no plausible claim that Defendant DiNapoli is liable for the actions of his staff members.

Nor do Plaintiff's allegations regarding the actions personally taken by Defendant DiNapoli suggest that he initiated the prosecution.  The primary focus of Plaintiff's claim is that Defendant DiNapoli publicly announced information from the "incompetent" audit investigation and made false statements about Plaintiff.  (Am. Compl. ¶¶ 86-89, 92-98.)  However, the Amended Complaint does not allege that Defendant DiNapoli himself was aware that the information was false.  *See Landon*, 2009 WL 2191335, at *7 (finding that the defendant did not initiate the prosecution when the plaintiff did not sufficiently allege that the defendant provided information to law enforcement "knowing the information it provided was false").  Moreover,

27

the alleged connection between Defendant DiNapoli's actions and the prosecution is too vague

to plausibly suggest that Defendant DiNapoli was actively involved in initiating or continuing

the prosecution.  For example, the plausibility of Defendant DiNapoli playing an active role in

the prosecution by making a public announcement in August 2007 is belied by Plaintiff's own

allegation that the prosecutors began investigating Plaintiff more than two years earlier in

December 2005, after meeting with Defendant Baker.  (Am. Compl. ¶ 58.)  Similarly, although

Plaintiff alleges that Defendant DiNapoli announced the results of the audit and that Defendant

Grady stated that Defendant DiNapoli "had been extremely cooperative in his ongoing

investigation" (*id.* ¶¶ 86-89, 91 (internal quotation marks omitted)), there is no allegation that

Defendant DiNapoli provided false information to the prosecutors.  Nor does Plaintiff allege that

anyone from the prosecutors' office was present at the press conference or that the prosecutors

relied on Defendant DiNapoli's statements, especially because Plaintiff does not allege that

Defendant DiNapoli even accused Plaintiff of committing crimes at this conference, let alone the

crimes with which he was charged.  This is fatal to Plaintiff's claim against Defendant DiNapoli.

*See Rohman*, 215 F.3d at 217 (noting that a defendant must play an "active role in the

prosecution" to be liable for malicious prosecution, and finding that this standard was not met

when the defendant was responsible for an investigation into the plaintiff at work, but did not

give the fruits of that investigation to the police or further the prosecution); *Mitchell v. Home*,

377 F. Supp. 2d 361, 377 (S.D.N.Y. 2005) (granting motion to dismiss because the defendant's

sending a statutorily required report to a state agency, which led to an investigation, did not

initiate the prosecution when there was no evidence that the police officer "relied upon, or was

even aware of, the allegedly false information given by" the defendant).  In stark contrast,

Plaintiff explicitly alleges that the other Defendants knowingly provided false information to the

prosecutors, which they principally relied on in bringing the prosecution.  (Am. Compl. ¶¶ 73-74.)  Accordingly, Defendant DiNapoli's Motion to Dismiss the malicious prosecution claim is granted.

C.  Due Process Claims Against Defendants Grady and Whitesell

Plaintiff alleges that Defendants Grady and Whitesell violated his Fourteenth Amendment due process rights by conducting a recklessly or intentionally deficient investigation into Plaintiff's actions.  (Am. Compl. ¶ 120.)  Defendants Grady and Whitesell argue that (1) as prosecutors, they are absolutely immune from liability, and (2) that Plaintiff has failed to state a claim.  (Defs. Grady and Whitesell's Mem. of Law in Supp. of Dismissal Under Rule 12(b)(6) and Absolute Prosecutorial Immunity ("Grady & Whitesell Mem.") 1.)

"It is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.'"  *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler v. Patchman*, 424 U.S. 409, 410, 431 (1976)) (internal citations omitted).  However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct."  *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000).  Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts must apply "a functional approach, which looks to the nature of the function performed [by the prosecutor]."  *Buckley*, 509 U.S. at 269 (internal quotation marks and citation omitted); *see also Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009) ("To decide whether absolute immunity

attaches to a particular kind of prosecutorial activity, one must take account of [] 'functional' considerations . . . .").

Generally, whether a prosecutor "may be sheltered by absolute immunity from liability for [his conduct] turns on whether or not [his conduct] occurred in the course of his role as an advocate." *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995). This protection covers such acts as "initiating a prosecution and presenting the case at trial" or at other court proceedings, *id.* at 661; *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("A prosecutor enjoys absolute immunity for acts taken in initiating a prosecution and in presenting the State's case, whether at a trial, a preliminary hearing, or a bail hearing." (internal citations and quotation marks omitted)), as well as "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273; *see also Hill*, 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (internal citations omitted)). Absolute immunity also protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement." *Bernard v. County of Suffolk*, 356 F.3d 495, 506 (2d Cir. 2004). Furthermore, it is well established that a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant to the granting of absolute immunity. *Shmueli*, 424 F.3d at 237.

In contrast, "[w]hen a [prosecutor] functions outside his . . . role as an advocate for the People, the shield of [absolute] immunity is absent." *Hill*, 45 F.3d at 661. Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police

officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (internal quotation marks omitted); *see also Smith*, 147 F.3d at 94 ("[W]hen a prosecutor . . . performs the investigative functions normally performed by a detective or police officer, he is eligible only for qualified immunity." (internal quotation marks omitted)).  Although the line between a prosecutor's acts as an advocate and as an investigator is often blurry, *Zahrey*, 221 F.3d at 347, "[t]he key . . . is the degree to which the specific conduct at issue is 'intimately associated with the judicial phase of the criminal process,'" *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler*, 424 U.S. at 430).  In assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant, but not dispositive.  *See id*. at 300-01; *see also Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) ("The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process . . . .").  For example, the Supreme Court has observed that absolute immunity is unavailable for investigative conduct that takes place before probable cause has been established:  "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."  *Buckley*, 509 U.S. at 274; *see also Zahrey*, 221 F.3d at 347 n.2 (explaining that *Buckley* "suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative").  The converse is not necessarily true, however.  "[A] determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5.

"[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery . . . because an absolute

immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Deronette v. City of New York*, No. 05-CV-5275, 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (internal quotation marks and brackets omitted). "However, the Second Circuit has held that, 'when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.'" *Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 65 (E.D.N.Y. 2010) (quoting *Hill*, 45 F.3d at 663).

Most of Plaintiff's allegations against Defendants Grady and Whitesell are thinly veiled malicious prosecution claims that are barred by absolute immunity. For example, Plaintiff makes a conclusory allegation that "Defendants Grady and Whitesell in their discussion . . . with witnesse[s] and review of potential evidence during the early stages of their investigation clearly understood that [Plaintiff] had not committed any criminal offense," and "intentionally chose to rely upon the false, malicious[,] and misleading statements made by [D]efendant[s] Baker, Sims[,] and the Board of Education in instituting [] [P]laintiff's prosecution." (Am. Compl. ¶ 74.) Similarly, Plaintiff asserts that Defendants Grady and Whitesell ignored evidence in making many false "alleg[ations]" against Plaintiff, which track the details of the bill of particulars, and ignored evidence in deciding "to indict." (Am. Compl. ¶¶ 72, 80; Rodd Aff. Exs. C, D.)

First, Plaintiff's labeling of the prosecutor's actions as investigatory does not make it so. *See Crews v. County of Nassau*, No. 06-CV-2610, 2007 WL 4591325, at *15 n.15 (E.D.N.Y. Dec. 27, 2007) ("[P]laintiffs' labeling various actions 'investigative' or 'administrative' in the complaint is of no moment."). Second, although Plaintiff vaguely alleges that Defendants Grady

32

and Whitesell's witness interviews and review of evidence occurred in the "early stages of their investigation," Plaintiff alleges that the prosecutors acted unconstitutionally by *instituting* the prosecution based on the false evidence.  In other words, although he labels the prosecutors' actions as "investigatory," Plaintiff alleges that Defendants Grady and Whitesell violated his constitutional rights by interviewing witnesses and evaluating evidence in order to decide whether to indict.  But, Defendants Grady and Whitesell are protected by absolute immunity for their professional evaluation of the evidence and subsequent decision to indict Plaintiff on various charges.  *See Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) (finding that the defendant prosecutor's "determination that the evidence was sufficiently strong to justify a probable-cause finding[] [and] her decision to file charges" "involved the exercise of professional judgment" and were protected by absolute immunity); *Williams v. City of New York*, No. 06-CV-6601, 2009 WL 3254465, at *10 (E.D.N.Y. Oct. 9, 2009) ("[E]valuating evidence and deciding whether to initiate a prosecution are exactly the sort of actions for which absolute immunity shields prosecutors from liability."); *Bhatia v. Gaetano*, No. 06-CV-1771, 2008 WL 901491, at *3 (D. Conn. Mar. 31, 2008) (finding that the decision to institute a prosecution "after considering the weight of evidence in the case," despite evidence that witnesses were lying, was protected by absolute immunity).  Moreover, to the extent Plaintiff alleges that Defendants Grady and Whitesell presented false evidence to or excluded exculpatory evidence from the Grand Jury, they are protected by absolute immunity for such acts of advocacy.  *See Peay v. Ajello*, 470 F.3d 65, 68 (2d Cir. 2006) (upholding lower court's decision to grant ADA's motion to dismiss on absolute immunity grounds where ADA allegedly suborned perjury and deliberately withheld exculpatory evidence from trial); *Bernard*, 356 F.3d at 506 (affirming dismissal on absolute

33

immunity grounds when the prosecutor allegedly knowingly presented perjured testimony to the grand jury).

Plaintiff's only specific allegation regarding allegedly investigatory action taken by Defendants Grady and Whitesell is that they met with Defendant Baker in December 2005. (Am. Compl. ¶ 58.)  This alleged interview occurred approximately six months prior to the decision to convene the Grand Jury in the summer of 2006 (Aff. of David L. Posner ("Posner Aff.") Ex. A), and, as a result, plausibly occurred prior to the prosecutors having probable cause to arrest Plaintiff.  *See Hill*, 45 F.3d at 661 ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts.").  Nevertheless, Plaintiff has failed to allege any due process violation stemming from this interview because he does not allege that the prosecutors committed any acts that violated his constitutional rights.

Of course, the Supreme Court and the Second Circuit have held that prosecutors are not protected by absolute immunity for fabricating evidence if they acted in an investigatory role. *See Buckley*, 509 U.S. at 275 (finding that absolute immunity did not protect prosecutors when "[i]t was well after the alleged fabrication of false evidence concerning the bootprint that a special grand jury was impaneled," noting that the prosecutors' alleged fabrication "occurred well before they could properly claim to be acting as advocates"); *Hill*, 45 F.3d at 662 ("[Absolute] immunity does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case.").  For example, in *Zahrey*, the Second Circuit held "that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty."  221 F.3d

at 344; *accord McGhee v. Pottawattamie County*, 547 F.3d 922, 933 (8th Cir. 2008) ("[Absolute] immunity does not extend to the actions of a [prosecutor] who violates a person's substantive due process rights by obtaining, manufacturing, coercing, and fabricating evidence before filing formal charges, because this is not a distinctly prosecutorial function." (internal quotation marks omitted), *cert. granted*, 129 S. Ct. 2002 (2009), *and dismissed*, 130 S. Ct. 1047 (2010)); *Milstein v. Cooley*, 257 F.3d 1004, 1006, 1011 (9th Cir. 2001) (finding that absolute immunity did not protect prosecutors from fabricating evidence by approaching a defense witness "for the purpose of inducing [him] to agree to testify falsely" against the plaintiff).  However, the Second Circuit has explained that "the investigatory act of obtaining evidence known to be false is not itself a violation of a constitutional right," but that a plaintiff may state a claim against a prosecutor "where a deprivation of liberty *results* from the initial act of obtaining evidence known to be false, at least . . . where the same person who fabricated the evidence forseeably used it." *Zahrey*, 221 F.3d at 354 (emphasis in original).[8]

Here, Plaintiff alleges that Defendant Baker relayed "fabricated and unsupportable claims" regarding Plaintiff to the prosecutors at the 2005 interview, including presenting the erroneous Palumbo check and claiming that Plaintiff was paid by Palumbo.  (Am. Compl. ¶¶ 58-65.)  Unlike the plaintiffs in *Buckley*, *Zahrey*, and *Hill*, who alleged that the prosecutors actively participated in fabricating evidence, Plaintiff does not allege that Defendants Grady and Whitesell fabricated evidence at this interview, or coerced, pressured, or encouraged Defendant

---

[8] The issue in *Zahrey* was not whether the prosecutor's act of allegedly fabricating evidence was investigatory or prosecutorial because the defendant prosecutor conceded, for purposes of the appeal, that his act was investigatory.  221 F.3d at 347 (declining to answer the question of whether "a prosecutor [] speaking with a potential witness prior to the witness's grand jury testimony" is "preparing as an advocate or developing evidence as an investigator" because the defendant did not dispute that he "was acting in an investigative role").

Baker to fabricate evidence.  Indeed, Plaintiff does not even allege that the prosecutors

influenced Defendant Baker's allegations in any way or knew, during the interview with

Defendant Baker, that the information he presented was false.  As a result, Plaintiff has failed to

allege that the prosecutors' mere participation in this interview caused any due process violation.

*See Urrego v. United States*, No. 00-CV-1203, 2005 WL 1263291, at *3 (E.D.N.Y. May 27,

2005) (granting defendant prosecutor's motion to dismiss when the plaintiff alleged that the

prosecutor spoke "with a potential witness [] prior to that witness' grand jury testimony" because

the "complaint [did] not allege that [the witness] was pressured to lie at that meeting" or "that

any documents were fabricated by the government"), *aff'd*, 186 F. App'x 97 (2d Cir. 2006); *see*

*also Bernard*, 356 F.3d at 506-07 (declining to exercise interlocutory jurisdiction over the

plaintiff's claim, noting that "the complaint [did] not accuse [the] defendant [prosecutor] of

using his various pre-indictment meetings . . . to induce th[e] witness to commit perjury");

*Norton v. Town of Islip*, No. 04-CV-3079, 2009 WL 804702, at *16 (E.D.N.Y. Mar. 27, 2009)

(dismissing the plaintiff's claim against the defendant prosecutor because although "the act of

conspiring to *create* false evidence is an investigatory function," the plaintiff failed to show that

the prosecutor falsified evidence or "added false information to the document" (emphasis in

original)), *rev'd on other grounds*, 2010 WL 2070550 (2d Cir. May 25, 2010); *cf. Conte v.*

*County of Nassau*, No. 06-CV-4746, 2008 WL 905879, at *4-5, *24-25 (E.D.N.Y. Mar. 31,

2008) (finding that absolute immunity did not protect prosecutors from allegations related to

their misconduct in conducting surveillance of the plaintiff, threatening witnesses with

prosecution if they did not cooperate, and spreading defamatory falsehoods); *Crews*, 2007 WL

4591325, at *15 & n.16 (finding that absolute immunity did not protect prosecutors from

allegations of "misconduct that took place in the course of participation in and supervision of

36

criminal investigations," such as allegedly attempting to coerce a confession prior to the plaintiff's arrest).[9]

Even construed liberally, Plaintiff does not allege any particular acts of investigative misconduct by Defendants Grady and Whitesell.  Rather, Plaintiff vaguely alleges that the prosecutors "recklessly investigated" Defendant Baker's allegations by "discount[ing] and hid[ing] evidence . . . [that] exonerated him."  (Am. Compl. ¶¶ 66-68.)  First, Plaintiff has presented no specific allegations to support his claim that the prosecutors acted recklessly or negligently during the investigation.  Rather, as Plaintiff makes clear, his claim is that the prosecutors "intentionally ignored [certain] facts made known to them during their investigation in their effort to maliciously prosecute [Plaintiff]."  (*Id.* ¶ 72.)  In other words, Plaintiff's complaint is that he disagrees with the prosecutors' decision to convene the Grand Jury and indict because Plaintiff believes that the prosecutors' ignored exculpatory evidence in making this decision.  But, as already explained, Defendants Grady and Whitesell's decision to discount or ignore certain evidence in deciding to prosecute Plaintiff is a prosecutorial decision cloaked

---

[9] Plaintiff did not specify whether he was asserting a procedural or substantive due process claim against Defendants Grady and Whitesell regarding their alleged investigatory actions.  Nor did the Second Circuit in *Zahrey* specify whether fabrication of evidence by prosecutors constitutes substantive or procedural due process violations.  *See Zahrey*, 221 F.3d at 349; *cf. Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *8 & n.14 (S.D.N.Y. Apr. 15, 2009) (characterizing the Second Circuit's decision in *Zahrey* as establishing a procedural due process right).  Regardless, for reasons already explained, Plaintiff has failed to sufficiently allege that the prosecutors fabricated evidence.  To the extent Plaintiff asserts a separate substantive due process claim regarding the prosecutors' supposed investigation, this claim is discussed *infra*, Section II.D.  The Court also notes that Plaintiff's claim does not fall within the confines of the Fourth Amendment because it relates to purported investigative failures occurring prior to Plaintiff's arrest.  *Cf. Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007) (finding that allegations regarding police officer's investigative misconduct occurring while the plaintiff was in police custody "fit[] comfortably under the coverage of the Fourth Amendment").

with absolute immunity.  *See Urrego*, 2005 WL 1263291, at *3 (finding that the plaintiff's allegation regarding the defendant prosecutor's alleged participation in a witness interview might show that the prosecutor knew that the evidence he presented to the grand jury (but did not fabricate) was false, but that presentation of false testimony was protected by absolute immunity); *see also Williams*, 2009 WL 3254465, at *10 (finding that the defendant prosecutors were protected by absolute immunity for "evaluating evidence and deciding whether to initiate a prosecution").  Second, courts have consistently rejected claims against prosecutors for alleged negligent investigations.  *See Fudge v. Town of Shandaken Police*, No. 09-CV-300, 2010 WL 3258385, at *8-9 (N.D.N.Y. Aug. 16, 2010) (rejecting claim that the defendant prosecutors "failed to properly investigate the witnesses' allegedly false statements and proceeded with their cases," because "there is no general obligation to investigate the veracity of witness' statements before deciding to prosecute" and "[t]he presentation of evidence to the Grand Jury is a prosecutorial function"); *Aretakis v. Durivage*, No. 07-CV-1273, 2009 WL 249781, at *31 (N.D.N.Y. Feb. 3, 2009) (noting "that alleging negligence does not support a claim that a person's constitutional rights were deprived"); *see also Curto*, 2005 WL 724156, at *10 n.9 (noting that the plaintiff's claim that the prosecutor "purportedly fail[ed] to also interview a witness she identified . . . [did] not implicate a constitutional violation").

Moreover, despite Plaintiff's continued assertions regarding Defendant Grady and Whitesell's alleged personal and political motivations (Am. Compl. ¶¶ 67-68, 72), their motivations are irrelevant to the absolute immunity analysis when Plaintiff's allegations boil down to a claim that the prosecutors were maliciously motivated in deciding to prosecute him.  *See Shmueli*, 424 F.3d at 237 (finding that absolute immunity applied regardless of the prosecutor's improper motivation or state of mind); *Bernard*, 356 F.3d at 507 ("[A] political

38

motive does not deprive prosecutors of absolute immunity from suit for authorized decisions made in the performance of their function as advocates.").  Accordingly, Defendants Grady and Whitesell's Motion to Dismiss Plaintiff's Due Process claims is granted.

D.  Deprivation of Liberty Interest Claim

Plaintiff's third claim, also brought pursuant to § 1983, alleges that Defendants Grady and DiNapoli made public comments regarding Plaintiff that they "knew to be false or about which [they] recklessly disregarded the truth," thereby depriving Plaintiff of a liberty interest in violation of the substantive due process clause of the Fourteenth Amendment.  (Am. Compl. ¶ 121.)[10]

"Generally, defamation is an issue of state, not of federal constitutional, law."  *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation.").  However, a plaintiff may bring a federal constitutional claim based on "defamation committed by government officials" if he "can demonstrate a stigmatizing statement plus a deprivation of a tangible interest," often called a "stigma-plus" claim.  *Vega*, 596 F.3d at 81 (internal quotation marks omitted).  "To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material

_____

[10] Grady is not entitled to absolute immunity protection with respect to his public comments because press conferences and statements are not part of a prosecutor's role as advocate.  *See Buckley*, 509 U.S. at 277-78 (finding that because "[t]he conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions[,] . . . a prosecutor is in no different position than other executive officials who deal with the press," and thus a prosecutor's "statements to the media are not entitled to absolute immunity").

state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Vega*, 596

F.3d at 81 (internal quotation marks omitted); *see also Segal v. City of New York*, 459 F.3d 207,

212 (2d Cir. 2006) ("[A] stigma-plus claim[] [] involves an injury to one's reputation (the

stigma) coupled with the deprivation of some tangible interest or property right (the plus),

without adequate process." (internal quotation marks omitted)).

To prove the "stigma" element, a plaintiff must show that the defendant made a

stigmatizing or defamatory statement about the plaintiff that jeopardized his "good name,

reputation, honor, or integrity." *Segal*, 459 F.3d at 212 (internal quotation marks omitted).

"[S]tatements that denigrate the employee's competence as a professional and impugn the

employee's professional reputation in such a fashion as to effectively put a significant roadblock

in that employee's continued ability to practice his or her profession will satisfy the stigma

requirement." *Id.* (internal quotation marks omitted); *see also Donato v. Plainview-Old

Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631-33 (2d Cir. 1996) (noting that although "vague

statements of unspecified incompetence [did] not harm an employee's professional reputation,"

specific and serious allegations that went "to the heart of [the plaintiff's] professional

competence" were sufficiently stigmatizing). A plaintiff must also show that "the stigmatizing

statements were made public." *Spang v. Katonah-Lewisboro Union Free Sch. Dist.*, 626 F.

Supp. 2d 389, 395 (S.D.N.Y. 2009).

Defendant Grady first argues that Plaintiff has failed to state a stigma-plus claim against

him because the claim is based only on Defendant DiNapoli's statement that Plaintiff put more

than a million dollars of taxpayer money at risk. (Grady & Whitesell Mem. 19-20.) It is true

that the Amended Complaint inartfully states that only Defendant DiNapoli commented about

the million dollars (Am. Compl. ¶ 88), and then later alleges a stigma-plus claim against both

40

Defendants Grady and DiNapoli based on this same comment, (*id.* ¶ 121).  However, the Amended Complaint alleges several other statements by Defendant Grady, such as that, when "specifically asked about the shared responsibility of the [Defendant] [B]oard for" the actions predicating the indictment, he stated that Plaintiff's "alleged illegal conduct took place without the knowledge or approval of the [Defendant] [B]oard and [] that 'there was only reason to charge [Plaintiff].'"  (*Id.* ¶ 69; *id.* ¶¶ 103-04 (alleging that on February 7, 2008, Defendant Grady publicly stated "several times" that Plaintiff acted "without the approval or knowledge of the [Defendant] [B]oard").)  The Court sees no reason why these other alleged statements, explicitly attributed to Defendant Grady, cannot be considered.

Moreover, the Court is not persuaded that Defendant Grady's alleged statements were not defamatory as a matter of law.  First, although Defendant Grady argues that some of his comments were not published in the Poughkeepsie Journal article about Plaintiff (Grady & Whitesell Mem. 23), there is no requirement that the alleged defamatory statements be published in a newspaper so long as they are made public.  *See Donato*, 96 F.3d at 631 (finding that statements in employee's personnel file were sufficiently publicized when they were "likely to be disclosed to prospective employers" (internal quotation marks omitted)).  Considering that Plaintiff alleges that Defendant Grady made statements at a press conference (Am. Compl. ¶ 69), Plaintiff has plausibly alleged that the statements were made public.  *See Malapanis v. Regan*, 340 F. Supp. 2d 184, 193-96 (D. Conn. 2004) (analyzing stigma-plus claim based on statements made at a press conference), *aff'd*, 147 F. App'x 219 (2d Cir. 2005); *see also D'Allessandro v. City of Albany*, No. 04-CV-788, 2008 WL 544701, at *4, *10-11 (N.D.N.Y. Feb. 26, 2008) (analyzing stigma-plus claim based on oral and written statements made to a city council).  Second, despite Defendant Grady's claims to the contrary, his statements about Plaintiff making

41

questionable decisions regarding hiring and payments to himself or others, without Board

approval, can plausibly be read to impugn his professional competence and damage his

professional reputation.  *See Donato*, 96 F.3d at 627, 633 (finding that comments about the

plaintiff being "ineffective as a disciplinarian" and "show[ing] a lack of concern in her

interactions with parents" were stigmatizing because they went "to the heart of her professional

competence and damage[d] her professional reputation"); *Spang*, 626 F. Supp. 2d at 393, 396

(finding that comments about the plaintiff superintendent improperly delegating tasks, and

failing to communicate with colleagues or timely finish work, could plausibly be stigmatizing

and impede the plaintiff's ability to find work); *Peres v. Oceanside Union Free Sch. Dist.*, 426 F.

Supp. 2d 15, 27 (E.D.N.Y. 2006) (denying motion to dismiss because statements about the

plaintiff teacher having "lapses of supervision and judgment" were plausibly stigmatizing

(internal quotation marks omitted)).  Accordingly, Plaintiff has sufficiently alleged the "stigma"

portion of his claim.

　　　　However, this is not the end of the inquiry.  To establish the "plus" element of a stigma-

plus claim, Plaintiff must allege a tangible, state-imposed burden, such as a "deprivation of a

legal right or status."  *Sadallah v. City of Utica*, 383 F.3d 34, 38-39 & n.3 (2d Cir. 2004)

(internal quotation marks omitted); *see also Vega*, 596 F.3d at 81 (noting that a plaintiff must

demonstrate a "deprivation of a tangible interest" that is "in addition to the stigmatizing

statement" (internal quotation marks omitted)); *Malapanis*, 340 F. Supp. 2d at 194

("Government imposition of a 'tangible burden' on future employment prospects may satisfy the

'plus' requirement.").  For example, courts have found that plaintiffs sufficiently stated a "plus"

by alleging termination of government employment, *Donato*, 96 F.3d at 631-32, suspension of a

medical license, *Diblasio*, 344 F.3d at 304, or placement on a government registry for child

abusers, *Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir. 1994). In contrast, damage to a plaintiff's

reputation is not a "tangible" burden that can alone establish the "plus" in a stigma-plus claim.

*See Siegert*, 500 U.S. at 233-34 (finding that damage to a plaintiff's reputation and impairment

of "future employment prospects" failed to satisfy the requirements of stigma-plus claim); *Paul

v. Davis*, 424 U.S. 693, 701 (1976) (holding that damage to a plaintiff's reputation alone does

not constitute a deprivation of liberty interest, and that the damage must be accompanied by a

more tangible interest). Additionally, Plaintiff must allege that the stigma and the plus were

"sufficiently proximate." *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005). Although the "stigma"

and "plus" need not have been contemporaneous, there must be rough temporal proximity so that

"the stigma and plus would, to a reasonable observer, appear connected." *Id.*; *see also Siegert*,

500 U.S. at 234 (noting that the defamatory statements must have been "incident to" the

plaintiff's termination); *Patterson*, 370 F.3d at 330 ("[P]laintiff must show the stigmatizing

statements were made concurrently in time to plaintiff's dismissal from government

employment.").

      Plaintiff alleges that he voluntarily entered into a severance agreement with the District

in November 2005, which set Plaintiff's last day of employment as February 9, 2006 (Am.

Compl. ¶¶ 13, 29), and that Defendants DiNapoli and Grady made stigmatizing statements in

August 2007 and February 2008, respectively (*id.* ¶¶ 87, 103), which damaged his "professional

standing and reputation" and ruined his career, (*id.* ¶¶ 116-17). These allegations fail to

sufficiently allege the "plus" element of a stigma-plus claim — damage to Plaintiff's reputation

and his resulting difficulty getting a job from the allegedly defamatory statements do not alone

constitute a tangible burden separate from the effects of the alleged defamation. *See Sadallah*,

383 F.3d at 39 (granting motion to dismiss when plaintiff had "not alleged a plus sufficient to

sustain a stigma plus claim," where plaintiff alleged damage to his "business reputation" and good will because such harms were not "in addition to the alleged defamation, but rather [were] direct deleterious effects of that defamation" (internal quotation marks and citation omitted)); *Jana-Rock Constr., Inc. v. City of Syracuse*, No. 05-CV-1191, 2007 WL 3274801, at *4 (N.D.N.Y. Nov. 5, 2007) (granting motion to dismiss because allegations that plaintiff lost contracts and potential contracts because of allegedly defamatory statements failed to sufficiently state "plus" element); *Trudeau v. N.Y. State Consumer Prot. Bd.*, 05-CV-1019, 2006 WL 1229018, at *13 (N.D.N.Y. May 4, 2006) ("The loss of revenue can be viewed as a deleterious effect[] flowing directly from a sullied reputation, and as such, would not constitute a 'plus' under the 'stigma plus' doctrine.").[11]

Indeed, Plaintiff's case is similar to *Siegert*, in which the plaintiff voluntarily left his government employment pursuant to a severance agreement and later claimed that statements

---

[11] Plaintiff's repeated reliance on *Valmonte* is misplaced.  In *Valmonte*, the Second Circuit found that the plaintiff's placement on a child-abuse registry could constitute the "plus" for a stigma-plus claim.  18 F.3d at 1001-02.  In so holding, the Second Circuit emphasized that child care providers were statutorily required to review the registry prior to hiring.  *Id.* at 1001-02.  As a result, the Second Circuit explained, the plaintiff had alleged "not just the intangible deleterious effect that flows from a bad reputation," but "[r]ather . . . a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state."  *Id.* at 1001.  In contrast, Plaintiff argues that he "will not be able to get a job" in public education because of the allegedly defamatory statements and because employers might conduct a background check on their own volition, without alleging any specific statutory impediment.  (Pl.'s Mem. 64 (internal quotation marks omitted).)  But, as already explained, damage to a plaintiff's job prospects cannot alone constitute the "plus."  Indeed, the Second Circuit in *Valmonte* explicitly stated that "the deleterious effects which flow directly from a sullied reputation [are] normally . . . insufficient [to constitute a plus], . . . includ[ing] the *impact that defamation might have on job prospects*, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."  *Valmonte*, 18 F.3d at 1001 (emphasis added).  Of course, the remedy for any defamation could be had in a state law tort action.  *See Chisholm v. Ramia*, 639 F. Supp. 2d 240, 245-46 (D. Conn. 2009) (noting that a "free-standing defamatory statement is not a constitutional deprivation, but is instead properly viewed as a state tort of defamation" (internal quotation marks omitted)).

made about his work performance to a prospective employer damaged his reputation and prevented him from gaining new employment.  500 U.S. at 228-29.  In *Siegert*, the Supreme Court found that the plaintiff had failed to satisfy the requirements of a stigma-plus claim because "injury to reputation by itself was not a 'liberty' interest protected under the Fourteenth Amendment," and because damages flowing from such reputational harm, including "impairment of his future employment prospects" were also insufficient.  *Id.* at 233-34.  Just as the plaintiff in *Siegert* voluntarily left his employment and later claimed reputational harm from defamatory statements, Plaintiff here signed a voluntary severance agreement and claims only that damage to his reputation and the resulting difficulties in obtaining employment are tangible burdens.

Notably, Plaintiff does not even allege, let alone argue, that the severance agreement itself or the termination of his employment constituted the "plus."  This is not surprising considering that the alleged defamatory statements were made well-over a year *after* Plaintiff signed the severance agreement and ceased working for the District.  Even construing Plaintiff's allegations liberally, such a time-gap cannot plausibly suggest the required proximity between the stigmatizing statements and the termination of Plaintiff's employment.  *See id.* at 234 (noting that the plaintiff failed to state a stigma-plus claim because "[t]he alleged defamation was not uttered incident to the termination of [the plaintiff's] employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later"); *see also Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (finding that five months between plaintiff's job termination and the allegedly defamatory statements was insufficient to establish "nexus" between the stigma and plus elements); *Holmes v. Gaynor*, 313 F. Supp. 2d 345, 360 (S.D.N.Y. 2004) (finding no proximate connection between plaintiff's

termination as a village employee and statements made by a village board member nine months

after the termination).[12]   Accordingly, Defendants Grady and DiNapoli's Motions to Dismiss the

stigma plus claim are granted.

E.  Deprivation of Substantive Due Process

Plaintiff's last claim, brought against all Defendants, is for a deprivation of substantive

due process for "engaging in [a] shocking course of conduct."  (Am. Compl. ¶ 122.)  As

Defendants point out, "where a specific constitutional provision prohibits government action,

plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to

the broad notion of substantive due process."  *Velez*, 401 F.3d at 94; *see also Conte*, 2008 WL

905879, at *14 n.12 ("[S]ubstantive due process analysis is not available where a more specific

constitutional standard is directly applicable." (internal quotation marks omitted)).  Indeed, the

Supreme Court has specifically declined to recognize a substantive due process right to be free

from criminal prosecution because the Fourth Amendment provides the basis for a claim of

"pretrial deprivations of liberty."  *Albright v. Oliver*, 510 U.S. 266, 274-75 (1994) (plurality

opinion).  Following this principle, courts dismiss Fourteenth Amendment due process claims

when the conduct involves an allegedly malicious prosecution because "the Fourth Amendment

provides the source for [such] a claim under Section 1983."  *Conte*, 2008 WL 905879, at *14

---

[12] Additionally, there is no allegation that the defamatory statements (made later) were in any way related to the severance agreement or Plaintiff's termination when Plaintiff merely alleges that Defendant DiNapoli's statements were made in connection with announcing the findings of the audit report and Defendant Grady's statements were made in connection with announcing the indictment.  *Cf. Velez*, 401 F.3d at 90 (finding that the plaintiff adequately alleged a stigma-plus claim when the defendants made stigmatizing statements regarding the plaintiff's criminal and inappropriate behavior that "explicitly requested her removal" from office, and that the decision to remove her from employment was "*expressly*" based on the stigmatizing statements (emphasis in original)).

n.12 (rejecting argument that actions constituting malicious prosecution, even if allegedly done "in [] an outrageously arbitrary way" could be based on substantive due process); *see also Russo v. City of Bridgeport*, 479 F.3d 196, 208-09 (2d Cir. 2007) (construing substantive due process claims brought pursuant to the Fourth Amendment); *Lenhard v. Dinallo*, No. 08-CV-165, 2009 WL 890596, at *6 (N.D.N.Y. Mar. 31, 2009) (finding that claims of due process regarding pre-trial deprivation of liberty should be analyzed under the Fourth Amendment).

Here, the Court has already explained why Plaintiff's allegations against Defendants Baker, Sims, the Board, and DiNapoli regarding the failed prosecution are properly brought as Fourth Amendment malicious prosecution claims, not Fourteenth Amendment substantive due process claims. Similarly, to the extent Plaintiff bases his "substantive due process" claim on the alleged public false statements of Defendants Grady and DiNapoli, this claim is subsumed by his stigma-plus claim, which is a procedural due process claim. *See Velez*, 401 F.3d at 93-94 (upholding motion to dismiss substantive due process claim when the alleged "outrageous" conduct was based on the same conduct allegedly constituting her First Amendment and stigma-plus procedural due process claims); *see also Conte*, 2008 WL 905879, at *14-15 (analyzing claim for deprivation of "due process" relating to plaintiff's alleged loss of business from defamatory statements under stigma-plus doctrine).

Moreover, most of Plaintiff's claims against Defendants Grady and Whitesell are aimed at their alleged decision to initiate a prosecution against Plaintiff based on false or misleading evidence and ignoring other exculpatory evidence. As already explained, this prosecutorial decision is protected by absolute immunity. Moreover, to the extent *Zahrey* contemplates a substantive due process claim against prosecutors for fabricating and using evidence, the Court has explained why Plaintiff failed to sufficiently allege such a claim here. Finally, Plaintiff has simply

47

failed to allege facts related to the prosecutors' purported investigation that are "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)); *see also Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) ("In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." (internal quotation marks, citation, and ellipsis omitted)); *Malapanis v. Regan*, 335 F. Supp. 2d 285, 295 (D. Conn. 2004) ("Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." (internal quotation marks omitted)), *aff'd*, 147 F. App'x 219 (2d Cir. 2005).  Specifically, Plaintiff vaguely alleges that the prosecutors "failed [in their] basic investigative responsibilities" and "hid[] evidence" (Am. Compl. ¶¶ 67-68), without alleging what evidence the prosecutors supposedly hid or what specific investigative acts were so arbitrary as to violate due process.  Indeed, Plaintiff alleges that the prosecutors were consistently lied to by Defendants Baker, Sims and the Board and were given (allegedly false) information suggesting that Plaintiff was involved in criminal activity.  (*Id.* ¶¶ 59-60, 72-75.)  Based on these allegations, Plaintiff has failed to present facts plausibly suggesting that the prosecutors' supposed investigatory conduct was so outrageous as to shock the conscious.  *See Kenific v. Oswego County*, No. 07-CV-213, 2010 WL 2977267, at *14 (N.D.N.Y. July 23, 2010) (granting motion to dismiss substantive due process claim based on allegations of a faulty investigation when the plaintiff did not plead facts "plausibly suggesting the absence of a reasonable basis for [the d]efendants' investigation and/or finding of abuse"); *Kozey v. Quarles*, No. 04-CV-1724, 2005 WL 2387708, at *6 (D. Conn. Sept. 28, 2005) (granting motion to dismiss substantive due process claim based on

alleged reckless investigation when, "[g]iven the very high standard courts have consistently used in evaluating substantive due process claims," the plaintiff's claim that the defendants failed to submit exculpatory evidence was insufficient because other available information supported the defendants' actions), *aff'd*, 252 F. App'x 387 (2d Cir. 2007); *see also Nelson v. Hernandez*, 524 F. Supp. 2d 212, 225 (E.D.N.Y. 2007) (granting summary judgment motion on Fourth Amendment claim regarding alleged failure to investigate exculpatory information because conclusory claim that, "had defendants done a thorough and proper investigation . . . they would have easily concluded that" the plaintiff was not the perpetrator, was insufficient to show that defendants conduct shocked the conscience). Therefore, Defendants' Motions to Dismiss the substantive due process claim are granted.[13]

### III.  Conclusion

For the reasons stated herein, Defendants' Motions to Dismiss are granted in part and denied in part.  Plaintiff's malicious prosecution claim against Defendant DiNapoli, due process claims against Defendants Grady and Whitesell, stigma-plus claims against Defendants Grady and

---

[13] Defendant Grady also argues that the entire Amended Complaint against him must be dismissed under Fed. R. Civ. P. 4(m) because the Court does not have jurisdiction over him as he was not properly served under Fed. R. Civ. P. 4(e).  Given that here: (1) the statute of limitations would not bar a re-filed action; (2) Defendant Grady clearly had notice of the claims asserted in the Amended Complaint as he responded to them on the merits; and (3) Defendant Grady has not explained why he would be prejudiced by allowing an extension of time to serve, the Court in its discretion would have granted Plaintiff an additional thirty days to properly serve Defendant Grady.  *See Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) (stating that "district courts have discretion to grant extensions" of time for service); *De La Rosa v. N.Y.C. 33 Precinct*, No. 07-CV-7577, 2010 WL 1737108, at *6 (S.D.N.Y. Apr. 27, 2010) (listing factors courts should consider in assessing prejudice to the parties when deciding whether to grant an extension); *Gore v. RBA Group, Inc.*, No. 03-CV-9422, 2009 WL 884565, at *7 (S.D.N.Y. Mar. 27, 2009) (granting extension of time pursuant to Rule 4(m)).  However, because the Court is dismissing Plaintiff's claims against Defendant Grady under Fed. R. Civ. P. 12(b)(6), the issue of service is moot.

DiNapoli, and substantive due process claims for "unconscionable conduct" against all Defendants are dismissed with prejudice. Plaintiff has already had two failed attempts at asserting colorable claims for these causes of action, and the Court finds that to be enough. *See Treppel v. Biovail Corp.*, No. 03-CV-3002, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless."). The Clerk of Court is respectively requested to terminate the pending motions (Dkt. Nos. 28, 34, 36, 37, 38, 43), and to terminate Defendants Grady, Whitesell, and DiNapoli as defendants.

SO ORDERED.

Dated:      September 30, 2010
            White Plains, New York

                                          KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE

<u>Service List (via ECF)</u>

Michael Howard Sussman, Esq.
Sussman & Watkins
Post Office Box 1005
55 East Main Street
Goshen, NY 10924

David Lewis Posner, Esq.
McCabe & Mack LLP
63 Washington Street, P.O. Box 509
Poughkeepsie, NY 12602

Steven Leon Banks, Esq.
New York State Office of the Attorney General (24th Floor)
120 Broadway, 24th Floor
New York, NY 10271

Paul G. Ferrara, Esq.
Costello, Cooney & Fearon
205 South Salina Street
Syracuse, NY 13202

Adam Lawrence Rodd, Esq.
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd, PLLC
555 Hudson Valley Avenue, Suite 100
New Windsor, NY 12553

Claudia Anne Ryan, Esq.
John Francis Moore, Esq.
Towne, Ryan & Partners, P.C.
450 New Karner Road
P.O. Box 15072
Albany, NY 15072