```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/7/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                   :

ROBERT C. WATSON,                 :

                                  :

                  Plaintiff,         :        09-cv-3055 (NSR)

    -against-                             :       OPINION AND ORDER

                                  :

WILLIAM GRADY, *et al.*             :

                                  :

                  Defendants.     :
-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

        Plaintiff Robert C. Watson, Sr. ("Watson," or "Plaintiff") brings this action pursuant to

42 U.S.C. § 1983 ("§ 1983") against District Attorney William Grady ("Grady," or "DA

Grady"), Deputy District Attorney Edward Whitesell ("Whitesell," or "ADA Whitesell"),

Comptroller Thomas DiNapoli ("DiNapoli"), Beth Sims, Esq. ("Sims"), Jeffrey Baker ("Baker"),

and the Board of Education of the City of Poughkeepsie School District ("the Board" or "the

School Board"),[1] asserting violations of his Fourth and Fourteenth Amendment rights.

## I.     BACKGROUND

        The facts are gleaned from the parties' Rule 56.1 statements, affidavits, declarations, and

exhibits, and are not in dispute, except where so noted.[2]

---

[1] References to "Defendants" in this Opinion refer to Sims, Baker, and the Board collectively, as the only remaining
defendants in this action.

[2] Local Civil Rule 56.1(d) requires that "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and
(b), including each statement controverting any statement of material fact, must be followed by citation to evidence
which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." S.D.N.Y. Loc. Civ. R. 56.1(d); *see also*
Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a
purported material fact). "This rule—simple to understand and apply—is designed to assist the Court by narrowing
the scope of the issues to be adjudicated and identifying the facts relevant and admissible to that determination."
*Potash v. Florida Union Free School Dist.*, 972 F. Supp. 2d 557, 564 n.1 (S.D.N.Y. 2013); *see also Holtz v.
Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the

## A. Factual Background

Plaintiff Robert C. Watson is a former Superintendent of Schools for the City of Poughkeepsie School District ("the District"). (Def. Ex. 17 at 11, 19-20.) [3] Defendant Jeffrey Baker served as the District's Business Manager. (Aff. of Jeffrey Baker [hereinafter "Baker Aff."] ¶¶ 2, 25; Def. Ex. 1 at 293.) Defendant Beth Sims served as outside counsel for the District. (Aff. of Beth Sims, Esq. [hereinafter "Sims Aff."] ¶ 4; Watson Aff. in Response to

---

consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

The failure of Plaintiff's counsel to follow the simple mandates of Local Rule 56.1 renders it difficult for the Court to determine which facts are actually in dispute based on the evidence versus which facts are simply "disputed" because Plaintiff alleges that they are in dispute. For example, in Plaintiff's Response to Defendant Sims's 56.1 Statement, Plaintiff disputed dozens of facts set forth by Sims without providing any citations to evidence to support his denials. He also admitted to pages and pages of facts testified to by various witnesses at the grand jury but alleged that their testimony was false or perjurious without citing any evidence to contradict their testimony. (*See* Pl.'s Response to Sims 56.1 Statement ["Watson 56.1 Sims Response"] ¶¶ 189-254.) In fact, there is not a single citation to any evidence in paragraphs 189-253 (incorrectly labeled as 254) of this Response, even though Plaintiff's responses are either denials of the facts that Sims set forth or allegations of perjury on the part of Sims. Plaintiff's own Rule 56.1 Counter-Statement in Opposition to Defendants' Motion for Summary Judgment ("Watson 56.1 Counter-Statement") similarly contains a large number of improper statements lacking citations to the record and setting forth conclusory and/or argumentative allegations rather than statements of posited fact. (*See, e.g.,* Pl.'s 56.1 Counter-Statement in Opp'n to Defs.' Mot. Summ. J. ¶¶ 6, 107, 111.) *Cf. Holtz,* 258 F.3d at 74 ("[A] Local Rule 56.1 Statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Additionally, Plaintiff's submissions appear to be missing several exhibits, which are listed in affidavits or referenced in the papers but were not included among the documents filed. While the Court has gone out of its way to attempt to locate these exhibits in other parts of the parties' submissions, it is Plaintiff who bears the burden of showing that there are material facts that remain in dispute. The Court cannot, and will not, find that Plaintiff has met this burden when the evidence he purports to cite to has not been provided to the Court for review.

My Individual Practices further set forth two requirements as to the form of summary judgment submissions that Plaintiff has disregarded. The first is that "[o]pposing parties shall reproduce each entry of the moving party's Rule 56.1 Statement and shall set out responses for each entry directly beneath it." Plaintiff's counsel did not do this for any of his responses to Defendants' 56.1 Statements. Second, my Individual Practices clearly set forth that "[a]ll courtesy copies must be clearly marked as such, bound, and tabbed." While this is certainly a less egregious problem than those discussed above, forcing the Court to wade through stacks of exhibits that are not clearly marked in order to find support for Plaintiff's factual representations imposes an additional burden on already-limited judicial resources and forces the Court to devote an excessive amount of time to simply attempting to find the documents cited among the thousands of pages submitted to the Court on the instant motions.

Plaintiff's counsel has been admonished for similarly deficient submissions multiple times by other members of this Court, including at least three opinions by Judge Ramos in 2012-2013 alone. *See Potash,* 972 F. Supp. 2d at 564 n.1; *Hoefer v. Board of Educ. of Enlarged City School Dist. of Middletown,* No. 10 Civ. 3244, 2013 WL 126238, at *1 n.3 (S.D.N.Y. Jan. 9, 2013); *Risco v. McHugh,* 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012) (collecting cases). As Judge Ramos noted: "It simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find them. Much more is expected from an experienced member of the bar of this Court." *Risco,* 868 F. Supp. 2d at 86 n.2.

[3] For ease of reference, all citations to the Defendants' joint exhibit submissions will be noted as "Def. Ex. [#]."

Sims's Mot. Summ. J. [hereinafter "Watson Sims Response Aff."] ¶ 2.) The District is governed by the Defendant Board of Education. (Ex. 9 ¶ 7.)

> 1. _Watson's Separation from the District_

Plaintiff served as the Superintendent in Poughkeepsie from July 2000 through February 9, 2006. (Def. Ex. 1 at 295; Def. Ex. 9 ¶¶ 10, 13; Def. Ex. 17 at 19-20; Baker Aff. ¶ 25.) On September 8, 2005, Watson requested an Executive Session of the Board be held for the purposes of having the Board consider purchasing the remainder of his employment contract with the District as Superintendent. (Def. Ex. 131.) An agreement (the "Separation Agreement") was negotiated and Watson and the Board ultimately entered into an agreement dated November 9, 2005, whereby the parties agreed to end the Superintendent's employment with the District. (Def. Ex. 93.) Watson's final working day as Superintendent was to be February 9, 2006. (Def. Ex. 93 at 1, ¶ 1.) Among other provisions, the Separation Agreement provided for a one-time payment to Watson of $163,500.00 (the amount of his yearly salary), less any necessary deductions for payroll purposes and any monies that had been previously improperly paid to Watson, as determined by the District's internal claims auditor. (Def. Ex. 93 at 1, ¶ 4; Sims Aff. ¶ 6.) Watson and the Board also ultimately signed an Addendum to this agreement, allowing the parties to cooperate with the investigation launched by the Duchess County DA's Office into the Agreement. (Def. Ex. 17 at 22-23; Def. Ex. 27 at 164-65.)

The Separation Agreement's terms were made public in November 2005. (Sims Aff. ¶ 6.) The agreement caused substantial controversy in Poughkeepsie. (Sussman Aff. Supp. of Pl.'s Counterstatement of Material Facts [hereinafter "Sussman 56.1 Aff."] Ex. 45 at 90.) As a result, the Duchess County District Attorney's Office (the "DA's Office") began to receive phone calls

regarding the circumstances surrounding the separation, urging the DA's Office to investigate the separation. (Def. Ex. 22 at 38-41; Def. Ex. 40 at 16-18.)

### 2. *The Audits*

Three different entities performed audits relevant to some of the issues involved in this matter.

The first audit is the Nugent & Haussler audit.[4] After Defendant Baker was suspended due to issues related to overtime pay within the Business Office, the Board hired the firm of Nugent & Haussler to perform an audit of the business practices of the office in June 2005. (Def. Ex 1 at 1204-1205; Def. Ex. 20 at 46; Def. Ex. 27 at 85-86; Def. Ex. 36 at 12-13.) Julia Fraino conducted the audit. She initially met with Watson, the President of the Board, and the District's attorneys to discuss the scope of the audit. (Def. Ex. 36 at 38-39.) Fraino also subsequently attended an Executive Session of the Board in June 2005. (Def. Ex. 36 at 126.) On July 15, 2005, Nugent & Haussler, through Fraino, issued a draft report to David Shaw of Shaw & Perelson, the District's attorneys at the time. (Def. Ex. 1 at 1206; *see* Def. Ex. 88.) Nugent & Haussler issued the final report in January 2006. (Def. Ex. 88.) The audit found improperly-paid overtime pay for exempt employees, as well as significant deficiencies in payroll function controls, a seemingly unauthorized retirement incentive payment to an administrator, and other concerns; the audit also found that overtime was paid pursuant to sidebar agreements that did not appear to have been reviewed by legal counsel or approved by the Board prior to being signed by the Superintendent. (*See* Def. Ex. 88 at 1-3, 8-9.) Watson argues that the Nugent & Haussler audit addressed a variety of items outside the scope of the original assignment, including, *inter alia*, sidebar agreements entered into by Watson, Irene Yozzo's retirement, and payment issues surrounding Watson's secretary. (*See* Pl.'s Response to Def. Board of Educ.'s Rule 56.1 Statement

---

[4] The Nugent & Haussler audit is also sometimes referred to by the parties as the Fraino Audit.

[hereinafter "Watson 56.1 Board Response"] ¶ 16.) Plaintiff's objection to the scope of the audit is irrelevant, however. The draft report was prepared before the DA's Office began its investigation, and the Board disclosed the audit report to the DA's Office after that office requested it. (Def. Ex. 18 at 24-25; Def. Ex. 136; Def. Ex. 140 at 2, ¶ 14.)

The second audit is the Cooper Niemann audit. The separation agreement between Watson and the Board provided for an audit "which shall be performed by the District's internal claims auditor, Cooper, Niemann & Company, LLP, of all payments made to the Superintendent during the period July 14, 2000 through June 20, 2006." (Def. Ex. 93 at 1, ¶ 4.) Anna Niemann from the Cooper Niemann firm issued a draft report in January 2006. (Def. Ex. 37 at 107; Def. Ex. 76.) The draft report detailed personal and "district business" days for which Watson had been paid but on which his contract was silent; a pay increase in 2005 on which his contract was silent; and various potentially problematic reimbursements, including for meals that were claimed where the claims and receipts contained discrepancies. (*See* Def. Ex. 76.) Watson prepared an initial response to what he perceived to be inaccuracies in the report, as well as a more detailed response that he forwarded to both the Board and the DA's Office. (Def. Ex. 17 at 196-97; Def. Ex. 77; Def. Ex. 101.) The final report, dated May 15, 2006, found, *inter alia*, that: Watson was paid for personal time off when his contract was silent on personal time; Watson was paid for days designated as district business days for days claimed as working out of the office for which the contract was also silent; Watson received a five percent salary increase for the fiscal year commencing July 1, 2005, on which the contract was silent; and reimbursement for several meals should be disallowed. (*See* Def. Ex. 78 at 2-5.) Watson had previously disputed nearly all of the auditor's findings, setting forth his disputes in a memorandum dated January 18, 2006, in response to the draft Cooper Niemann report. (*See* Def. Ex. 101.)

The final audit was conducted by the New York State Office of the State Comptroller ("OSC"), and appears to have occurred approximately concurrently to the investigation by the DA's Office. The OSC's audit of the District began in June 2006, and the main examiners involved were Jerome Bankowski and Kevin Kissane. (Def. Ex. 39 at 72, 74, 81, 125; Def. Ex. 42 at 6.) Bankowski and Kissane met with Defendant Baker and interim Superintendent Donald Rothman, their initial points of contact, on June 22, 2005. (Def. Ex. 42 at 13, 21-24.) The objective of the OSC audit "was to determine if internal controls over selected financial activities were appropriately designed and operating effectively for the period July 1, 2004 to June 22, 2006." (Def. Ex. 116 at 5.) The scope of the audit was expanded to include certain payroll-related agreements dating back to March 2003 and professional services relating to the District's professional services relating to a capital project dating back to July 17, 2002. (Def. Ex. 116 at 5.) The OSC audit found several problems during this time period. The audit report noted that "[t]he Board approved transactions without asking appropriate questions and requiring appropriate supporting documentation," and that "[t]he former Superintendent [Watson] used the Board's lenient attitude towards internal controls to make decisions that may not have been in the best interest of the District." (Def. Ex. 116 at 5-6.) The OSC audit found that these questionable decisions on the Superintendent's part included the selection and hiring process for four administrative positions,[5] various unapproved agreements with administrators,[6] and inappropriate payments to consultants and other vendors. (Def. Ex. 116 at 6.)

3.   *The Sidebar Agreements*

During his tenure as Superintendent, Watson executed a series of "sidebar agreements" on behalf of the District with various district employees and unions. One sidebar agreement

---

[5] These are the coordinator positions for the Circle of Courage School, discussed in further detail in Section I.A.6, *infra*.

[6] These sidebar agreements are discussed in further detail in Section I.A.3, *infra*.

between the District and the City of Poughkeepsie Public School Administrators Association

("PPSAA"), dated March 26, 2003, provided for additional compensation to administrators at a

rate of $75.00 per hour for additional work in certain areas. (*See* Watson Sims Response Aff. Ex.

4 (sidebar agreement regarding additional compensation for administrators); *see also* Def. Ex. 4

at 10.) Another sidebar agreement between Watson and the PPSAA allowed for use of an

administrator's previous employment in other school districts in calculating eligibility for

longevity payments, at the Superintendent's discretion. (*See* Watson Sims Response Aff. Ex. 4

(sidebar agreement regarding longevity payments); *see also* Def. Ex. 4 at 11.) Other similar

agreements or authorizations made by the Superintendent touched on insurance flex plans and

medical benefits, a staff member's unused vacation days, and the "waiver" of certain

requirements in order to enable Irene Yozzo, a District employee, to take advantage of a

retirement incentive. (*See* Watson Sims Response Aff. Ex. 4 (sidebar agreements regarding

insurance flex plan contributions); *see also* Def. Ex. 4 at 11-12.) The Board did not pass

resolutions approving any of these agreements or authorizations. (Def. Board of Education's

Civil Rule 56.1 Statement of Material Facts [hereinafter "Board 56.1 Statement")] ¶ 7; Watson

56.1 Board Response ¶ 7 (admitting that Board did not pass any resolutions approving sidebar

agreements); *see also* Def. Ex. 4 at 10-12.) Further, the Nugent & Haussler auditor Julie Fraino

noted that the Superintendent is not authorized to enter into any agreements on behalf of the

Board in this manner, and that such agreements would be deemed illegal. (*See* Watson Sims

Response Aff. Ex. 9 (memorandum from Julie Fraino regarding District's comments on draft

audit report).) Watson contends that he informed the Board of each of these items and received

the Board's approval. (*See* Watson 56.1 Board Response ¶¶ 6-7; Watson Aff. in Response to

Baker's Mot. Summ. J. [hereinafter "Watson Baker Response Aff."] ¶¶ 4, 5, 17, 20-21, 24-26.)

4.   *The Palombo Payment*

One of the main controversies leading up to Watsons' indictment involved a payment made in fall 2005 to the Palombo Group for construction management services. (*See* Def. Ex. 4 at 5-7.) In September 2005, the Palombo Group submitted an invoice to the District for services rendered in an amount of $269,866.79. (Def. Ex. 9 ¶¶ 38, 44; Ex. 27 at 146; *see also* Def. Ex. 4 at 5.) The Board, in a meeting on October 11 of that year, approved a payment to the Palombo Group of approximately $224,000. (*See* Def. Ex. 111 at 115.) This approval was allegedly based on Watson's representation to the Board that Mr. McGrath, the Director of Facilities and Operations, had reviewed the submitted documentation and approved the payment. (Def. Beth Sims' Statement of Material Facts Pursuant to Local Rule 56.1 [hereinafter "Sims 56.1 Statement")] ¶¶ 168, 213; *see* Def. Ex. 1 at 1039; Def. Ex. 159; Sussman 56.1 Aff. Ex. 25.) Watson denies having made this representation to the Board. (Pl.'s 56.1 Counter-Statement in Opp'n to Defs.' Mot. Summ. J. [hereinafter "Watson 56.1 Counter-Statement"] ¶ 181; Watson Aff. Supp. of Counterstatement of Material Disputed Facts [hereinafter "Watson Counter-Statement Aff."] ¶ 4; Watson Baker Response Aff. ¶ 29; Watson Sims Response Aff. ¶ 19.) Mr. McGrath later testified before the Grand Jury that he had not seen the documentation provided by the Palombo Group until after the payment had already been approved by the Board. (Def. Ex. 1 at 1405-07.) A check was incorrectly sent to the Palombo Group for $244,000. (*See* Def. Ex. 190.) Watson contends that Baker had the check prepared with the mistaken amount in order to cast blame on Watson in some way; Defendants point to the mistake as being caused by Watson.

5. *Watson's Compensation as Superintendent and Related Issues*

The audits revealed problems concerning Watson's compensation, expense reimbursements, and related items, which were eventually deducted from the payout under Watson's severance agreement with the District and some of which formed the basis for the charges in the grand jury indictment. According to the Cooper Niemann audit performed pursuant to the Separation Agreement, Watson was incorrectly paid in the following ways: he accepted payment for services at conferences and at the same time was paid for doing work for the District; he was reimbursed for unused vacations day in excess of contractual limits; he charged the district for conference days when he was actually on vacation; and he ordered the Business Office staff to give him a five percent cost of living increase in salary in mid-2005, without prior Board approval. (*See* Def. Ex. 78 at 2-3.) Many of these compensation-related issues formed the basis for Count Two of the indictment. (*See* Def. Ex. 3 at 7-10; Def. Ex. 4 at 14.) Watson disputes that any of these payments to him were improper. (*See* Def. Ex. 77 (detailing Plaintiff's objections to each portion of Cooper Niemann draft audit report).)

Additionally, Niemann, in conducting the audit, reviewed old claims for reimbursement that Watson had previously submitted for meals, including some meals that he claimed to have had with Sims. Sims disputed a number of these claims, stating that they had not had some of the claimed meals together, that she had paid for the meals, or that they had occurred before she was officially employed as the District's counsel. (*See* Def. Ex. 78 at 4-5; Sims Aff. ¶ 60.) Watson alleges that these meals all occurred and were properly reimbursed, and that any problems with his reimbursement claims should have been brought to his attention by the Business Office. (Def. Ex. 101.) These disputed reimbursements form a portion of the conduct charged in the second count of the indictment. (Def. Ex. 3 at 8-9.)

6. *The Circle of Courage School*

Some of the factual allegations supporting the first count of the indictment returned by the grand jury against Watson involved the staffing of the Circle of Courage School. In June 2002, Watson contracted with Dwight Paine, Frank Mulhern, Theodore Arrington, and John Rodriguez to consult and create educational programming for the Circle of Courage School; these four individuals went on to become the administrators of the school in July 2002, based on Watson's recommendation to the Board that they be hired for salaried positions in the newly-created school. (*See* Def. Ex. 17 at 86-88; Def. Ex. 116 at 11.) Theodore Arrington served as Dean of Students at the Circle of Courage School, and eventually had to be removed because he did not receive his administrator certification, as required by the position he held; he was transferred to a "social worker" type position at another school, but continued to receive the same salary. (*See* Def. Ex. 1 at 409-15.) Dwight Paine was also removed from his position at the Circle of Courage School, and was moved to a newly created position of Assistant to the Superintendent, with a salary approximately equal to what he had previously received. (*See* Def. Ex. 1 at 459-67.)

Watson was also charged, in counts three, four, five, and six of the indictment, with offering a false instrument for filing. (Def. Ex. 2 at 2-4; Def. Ex. 3 at 10-12.) In June 2002, written recommendations for the appointments of Mulhern, Rodriguez, Paine, and Arrington were submitted to the Board. (*See* Def. Ex. 64 (Rodriguez recommendation for appointment); Def. Ex. 65 (Paine recommendation for appointment); Def. Ex. 66 (Arrington recommendation for appointment); Def. Ex. 67 (Mulhern recommendation for appointment).) These forms indicated that Watson had interviewed at least five individuals for each of the four positions— Coordinator of the Circle of Courage Program, Coordinator of Behavioral Management,

Coordinator of Portfolio Assessment, and Dean of Students at the Circle of Courage School. (Def. Ex. 116 at 11-12.) In fact, the only individuals who were interviewed for these positions were the four individuals who were ultimately hired to fill these positions. (*See* Def. Ex. 116 at 11.) Additionally, a note on one of the forms indicated that a second administrator was present when Rodriguez was interviewed, but the individual identified on the form was not actually present during the course of the interview. (*See* Def. Ex. 116 at 11-12.)

       7.   *The District Attorney's Investigation, the Grand Jury, and the Indictment*

ADA Whitesell and District Attorney Grady convened a special term grand jury, which met several times over the course of approximately eighteen months, from October 2006 to February 2008. (*See* Def. Ex. 1; Def. Ex. 21 at 15-17, 38-45.) During the grand jury proceedings, approximately 35 witnesses testified regarding the circumstances surrounding several items that the DA's Office had been investigating, including the separation agreement, the administration at the Circle of Courage School, reimbursements made to Watson for various meals, certain sidebar agreements made by Watson, and the specific terms of his employment contract. (Def. Ex. 4 at 1; *see generally* Def. Ex. 1.) Defendants Baker and Sims were among the witnesses who testified before the grand jury. (Def. Ex. 1 at 292-396, 705-45, 770-871, 929-73, 1069-1105, 1233-90.) Board members Susan Houston-Marks, Ellen Staino, Thomas Jefferson, Stanley Merritt, and Robert Collier also testified. (Def. Ex. 1 at 34-42, 203-39, 240-61, 262-90, 556-591, 592-99, 600-617, 618-54, 1000-68, 1214-32; Moore Aff. Ex. B, Aff. of Stanley Merritt [hereinafter "Merritt Aff."] at ¶ 10; Moore Aff. Ex. C, Aff. of Ellen Staino [hereinafter "Staino Aff."] ¶¶ 7-8.) Some of the testimony by Board members occurred after their Board membership had already ended. (*See, e.g.*, Merritt Aff. ¶ 10.) In addition, approximately 115 documentary exhibits were provided to the grand jury. (Def. Ex. 4 at 1.) Watson was afforded the opportunity to testify, but chose not to. (*See* Ex. 22 at 101-02; Def. Ex. 79; Def. Ex. 80.)

On February 4, 2008, the Grand Jury returned a seven-count indictment against Plaintiff, charging him with two counts of Grand Larceny, four counts of Offering a False Instrument for Filing, and one count of Payment of an Unqualified Teacher. (*See* Def. Ex. 2.) Count one of the indictment specifically charged Watson with grand larceny in the second degree for payments made to the four Circle of Courage School administrators, Plaintiff's entry into unauthorized sidebar agreements, the payment of the Yozzo retirement incentive, and Plaintiff's alleged misrepresentations surrounding the Palombo payment. (Def. Ex. 2 at 1; Def. Ex. 3 at 1-6.) Count two of the indictment specifically charged Plaintiff with grand larceny in the third degree for allegedly submitting and receiving improper and unauthorized payments for meal vouchers, personal time, unused vacation days, days he did not work, and a salary increase. (Def. Ex. 2 at 1; Def. Ex. 3 at 7-10.) Counts three through six of the indictment charged Plaintiff with offering a false instrument for filing for allegedly submitting false statements regarding interviews with applicants to the school district. (Def. Ex. 2 at 2-4; Def. Ex. 3 at 10-12.) Finally, count seven of the indictment charged Plaintiff with the misdemeanor of payment of an unqualified teacher, for the salary paid to Theodore Arrington, the Dean of Students of the Circle of Courage School. (Def. Ex. 2 at 4-5; Def. Ex. 3 at 13-14.)

### 8. *Watson's Motion to Dismiss the Indictment and Trial*

Watson moved to dismiss the indictment on the ground that it was legally insufficient. (*See* Def. Ex. 5.) In a Decision and Order filed July 14, 2008, Judge Dolan denied the motion to dismiss the indictment, finding that probable cause existed: "[T]he indictment is based upon evidence which is legally sufficient to establish that the defendant committed the offenses as set forth therein and competent and admissible evidence before the Grand Jury provides reasonable cause to believe that the defendant committed those offenses." (Def. Ex. 8 at 2-3.) The matter

then proceeded to a bench trial. Watson was acquitted in November 2008 of all charges. (Def. Ex. 9 ¶ 23.)

### B.  Procedural History

Plaintiff filed his initial Complaint on March 30, 2009. (ECF No. 1.) He filed an Amended Complaint on June 29, 2009. (ECF No. 22.) In an Opinion and Order issued by Judge Karas, the Court dismissed all of Plaintiff's claims against Defendants Grady, Whitesell, and DiNapoli, and the deprivation of substantive due process claims against Defendants Baker, Sims, and the Board. *See* Watson v. Grady, No. 09 Civ. 3055, 2010 WL 3835047, at *8 (S.D.N.Y. Sept. 30, 2010), ECF No. 49. Only the malicious prosecution claims against Defendants Baker, Sims, and the Board remain. Defendants filed their respective motions for summary judgment on July 14, 2014. (*See* ECF Nos. 103, 112, 133.)

## II.      STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. The Rule states, in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also meet its initial burden that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *Hill v. Melvin*, No. 05 Civ. 6645, 2006 WL 1749520, at *4 (S.D.N.Y. June 27, 2006) ("The movant may

discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof."); *Fuertado v. City of New York*, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004) ("The moving party may use a memorandum or brief to 'point to' the absence of evidence and thereby shift to the nonmovant the obligation to come forward with admissible evidence supporting its claim.").

If the moving party fulfills its preliminary burden, the onus shifts to the non-movant to prove or raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A). The party asserting that a fact is genuinely disputed must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001). The non-movant must support their assertion by "citing to particular parts of materials in the records" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))). Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

When multiple parties have moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## III.    DISCUSSION

Plaintiff alleges, pursuant to § 1983, that Defendants Baker, Sims, and the Board violated his constitutional rights by maliciously prosecuting him. (Def. Ex. 9 ¶ 119.) Before turning to Plaintiff's malicious prosecution claims, there are two threshold issues that must first be addressed.

## A.  Defendant Sims and § 1983 Liability for Private Actors

To prevail on any claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law." *Landon v. Cnty. of Orange*, No. 08 Civ. 8048, 2009 WL 2191335, at *4 (S.D.N.Y. July 23, 2009); *see also Chambliss v. Rosini*, 808 F. Supp. 2d 658, 666 (S.D.N.Y. 2011).  "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005)). A person's "private" status does not completely immunize her from liability under § 1983, however. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 847 (1982) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action." (internal quotation marks omitted)).  There is no single test for determining whether the actions of a private entity or person have crossed into the realm of state action; rather, three main tests have emerged:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state . . . (1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test").

*Fabrikant*, 691 F.3d at 207 (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001); *Hogan v. A.O. Fox Memorial Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009); *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002); *Tewksbury v. Dowling*, 169 F. Supp. 2d 103, 108 (E.D.N.Y. 2001).  The fundamental question that underlies each of these tests

is whether the challenged actions of the private actor are "fairly attributable" to the state. *Rendell-Baker*, 457 U.S. at 838.

It is well established that a private attorney is not generally considered a state actor for the purposes of § 1983. *See McCluskey v. N.Y. State Unified Court Sys.*, 442 F. App'x 586, 589 (2d Cir. 2011) (indicating that "private actors are not proper § 1983 defendants"). "Private parties conspiring with a state official are acting under color of state law," however, and thus can be held liable under § 1983 in some situations. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). In order for Sims to be liable under § 1983, Plaintiff must show that she was working "in concert" with a state actor, such that she "is a willful participant in joint activity with the State or its agents." *McCluskey*, 442 F. App'x at 589; *accord Ciambriello*, 292 F.3d at 324 ("[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents."). A conclusory allegation that a private party acted in concert with a state actor is not sufficient. "To defeat [a] non-government defendant['s] motion for summary judgment . . . [Plaintiff] must present sufficient evidence to support an inference that an improper conspiracy took place." *Scotto*, 143 F.3d at 114.

Plaintiff has already conceded that Sims cannot be considered a state actor merely for being hired as an attorney for the District. *See Watson v. Grady*, No. 09 Civ. 3055, 2010 WL 3835047, at *8 (S.D.N.Y. Sept. 30, 2010), ECF No. 49. However, Plaintiff contends that a reasonable jury could find that Sims worked in concert with Baker and the Board to shift blame to Watson. Sims avers that Plaintiff failed to present any evidence to support his contentions of conspiracy and joint activity.

Plaintiff identifies a few key facts that purportedly show that Sims was working in concert with the Board and Baker in order to maliciously prosecute Watson. First, he points to an

October 2005 meeting between Sims, Shaw, and Baker. Second, he alleges that Sims "materially contributed to Baker's 'fiction'" by lying to prosecutors when she told them that Watson had represented in a Board meeting that McGrath had reviewed the Palombo binder before the meeting. (*See* Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 6.) Third, Plaintiff claims that Sims met with the DA's Office, reviewed Baker's notes, and "commented topic by topic to the DA." (Id. at 55.) Watson submits that it is thus clear that "[s]he [Sims] and Baker were obviously engaged in parallel, concerted activity with a common objective—to pin the tail on Watson and see him be held accountable for whatever ailed the school district." (Id. at 55.)

Sims sets forth as undisputed in her 56.1 Statement that she and Baker did not collaborate to obtain evidence against Watson in order to negatively impact Watson's employment at the District, or to be used in prosecuting him. (Sims 56.1 Statement ¶¶ 123, 124.) While Plaintiff contends that this remains a factual dispute appropriate for jury determination, he does not point to any evidence that would support his contention.[7] Thus, Plaintiff has pointed to no evidence immediately disputing Sims's contention that the record evidence shows that she and Baker did not work in concert such that Sims should be liable under § 1983.

Much of Plaintiff's contention regarding Sims's liability rests on a meeting that occurred on October 12, 2005 in which the District's attorneys, Shaw and Sims, met with Baker on behalf of the Board and at its request. Defendant avers that this meeting was held in order to discuss any knowledge Baker had of improper actions by District officers or employees. (Sims 56.1

---

[7] Plaintiff argues that "[a]ccording to Baker, on November 19, 2005, Sims called him 'requesting information regarding [Watson's] salary and attendance . . . Beth said it was urgent that the information she requested concerning [Watson] be compiled immediately . . . .'" (Watson 56.1 Sims Response ¶ 123.) For support, Plaintiff cites to Exhibit 42 of counsel's affirmation in response to Sims's motion. (*See* Watson 56.1 Sims Response ¶ 123; Aff. of Michael Sussman in Response to Def. Beth Sims' Mot. Summ. J., Ex. 42 (missing).) This document, however, is not actually attached to the Sussman 56.1 Affirmation, and the Court was unable to locate it among any of the documents provided by Plaintiff or Defendants based on the limited information provided by Plaintiff as to its contents. Plaintiff additionally disputes this by stating that Sims prepared a falsified account of her involvement with the Palombo matter, but does not support this contention with a citation to any evidence that would show that the account prepared by Sims was false. (*See* Watson 56.1 Sims Response ¶ 41.)

Statement ¶ 20.) Plaintiff contends that a reasonable jury could find that the attorneys met with
Baker to determine whether he had any "dirt" on Watson in order to improve the Board's
bargaining position for the negotiations with Watson concerning severance, thus showing that
Sims was a willful participant in joint activity with the Board and Baker. (Watson 56.1 Sims
Response ¶ 20.) The parties who attended the meeting testified that the Board, through its
counsel, simply offered Baker an opportunity to disclose anything he perceived to be improper
activity on the part of District officers or employees, which would include Watson as
Superintendent. (Sims Aff. ¶ 32; Def. Ex. 29 at 87-89; Def. Ex. 27 at 184-85; Def. Ex. 25 at 218;
Def. Ex. 159.) Plaintiff characterizes this meeting as having a more conspiratorial nature, relying
on deposition testimony of Sims and Shaw to interpret the meeting as one in which the Board
and its counsel sought information to smear Watson. According to testimony from Sims, the
Board members provided counsel with "a list of things they wanted to do" that related to
concerns with Plaintiff's practices. (Sussman 56.1 Aff. Ex. 1 at 199-201.) Plaintiff also purports
to provide evidence that, according to Shaw, the attorneys met with Baker because the Board
"wanted to determine whether there was any embarrassing information about Mr. Watson that
might be revealed and could embarrass the Board if it entered into a severance agreement."
(Watson 56.1 Sims Response ¶ 20; Aff. of Michael Sussman in Response to Def. Beth Sims' Mot.
Summ. J. [hereinafter, "Sussman Sims Response Aff."] Ex. 2 at 121-22.) It is unclear from the
excerpt of deposition testimony provided to the Court exactly how Shaw viewed the meeting and
what its purpose was, as Plaintiff's counsel was the one who characterized the meeting (in his
question to Shaw) as one held "to determine whether there was any embarrassing information
about Mr. Watson;" these are not Shaw's words. However, Shaw did answer counsel's question
in the affirmative. (Sussman Sims Response Aff. Ex. 2 at 122.) While Plaintiff's interpretation of

events would require that the fact-finder draw inferences from the testimony and pass judgment on the credibility of the Board's counsel as witnesses rather than simply relying on the attorneys' direct words, at this stage the Court is required to draw all inferences in his favor and refrain from passing judgment on the perceived credibility (or lack thereof) of witnesses. Thus, a factual dispute remains regarding the intent behind the October 12 meeting and whether it implicates Sims in joint activity with the Board and Baker, who are state actors.

Plaintiff also points to disputed facts regarding the October 11, 2005 Board meeting in which the $224,000 Palombo payment was approved. Sims testified before the grand jury that Plaintiff indicated at the meeting that he and Merritt were on the building committee and knew the work had occurred, and that she had questioned how Plaintiff knew that each of the items contained in the Palombo binder had been done. (Sims 56.1 Statement ¶ 166). Sims also testified that Plaintiff told the Board at the meeting that McGrath had reviewed the binder and believed payment was appropriate because the work had been done; her recollection of Plaintiff's statement to the Board is also memorialized in a memorandum to ADA Whitesell. (Sims 56.1 Statement ¶¶ 168, 213; *see* Def. Ex. 159; Sussman 56.1 Aff. Ex. 25.) Other witnesses confirmed and/or testified regarding Plaintiff's alleged misrepresentation at the Board meeting. [8] (*See* Def. Ex. 1 at 1039; Def. Ex. 28 at 22.) Watson denies ever making such a statement. (Watson 56.1 Counter-Statement ¶ 181; *see* Watson Aff. in Supp. of Counterstatement of Material Disputed Facts ¶ 3.) This essentially pits the Defendants' recollections of the meeting against Watson's own competing version of events, thus raising an issue of fact. The Court need not weigh the

---

[8] Plaintiff contends that neither Sims nor Merritt testified to that fact. He then states that Sims falsely claimed that Plaintiff represented to the Board that McGrath reviewed the binder and approved the payment. Plaintiff fails to support his claim that Sims's testimony is false. Additionally, Merritt did, in fact, testify regarding this alleged misrepresentation by Plaintiff at the Board meeting. (*See* Def. Ex. 1 at 1039.)

evidence itself in deciding a summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Finally, Watson asserts that Sims intended to assist the District Attorney in targeting him in order to draw attention away from the Board, and this shows that she was working in concert with the Board and Baker. Sims contends that prior to her testimony at the grand jury, she only dealt with the District Attorney in her capacity as counsel for the school district. (Sims 56.1 Statement ¶ 48). Sims also submits that the Board, through her as its attorney, provided the DA's Office with only the information and documentation that was requested. (Sims 56.1 Statement ¶ 71). Plaintiff has failed to point to any evidence disputing these contentions by Sims.[9] Though Plaintiff states that a meeting between Sims and ADA Whitesell occurred before she testified at the grand jury, he has not pointed to any evidence to suggest anything untoward occurred at this meeting. (*See* Watson 56.1 Counter-Statement ¶ 125.) Although he could not recall exactly when, ADA Whitesell acknowledged meeting with Sims before she testified at the grand jury. (*See* Watson 56.1 Counter-Statement ¶ 125; Sussman 56.1 Aff. Ex. 13 at 118.) Sims affirmatively denied the existence of any conspiracy to prosecute Watson, and Plaintiff's "unsubstantiated speculation" that the meeting was conspiratorial in nature is insufficient to raise a question of material fact. The evidence does "no more than demonstrate that [Defendants] cooperated with [law enforcement's] investigation into [plaintiff's] alleged [misconduct]." *Scotto*, 143 F.3d at 114-15.

---

[9] Plaintiff argues that Sims also represented information to the DA's Office based on her own status as a witness to certain events. He then cites to ADA Whitesell's deposition testimony in support of this contention, but the testimony cited to does not support his argument. Even drawing any reasonable inferences in Plaintiff's favor, his contention is still not supported. Plaintiff argues that Sims sent ADA Whitesell documents that were not requested. However, ADA Whitesell's request is broad and asks for "Any and all correspondence between the City of Poughkeepsie Board of Education and Robert Watson regarding his impending separation from the District;" Plaintiff has failed to single out any documents that he contends fall outside the scope of ADA Whitesell's requests. *Cf. Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("[S]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.").

At the summary judgment stage, the Court's function is not to weigh the evidence, but simply to inquire whether there remain disputed material facts such that there is the need for a trial. *See Anderson*, 477 U.S. at 249-50. Because the Court must examine the evidence in the light most favorable to Plaintiff as the non-moving party and draw all reasonable inferences in his favor, this Court ultimately finds that Plaintiff has sufficiently pointed to genuine factual disputes material to the question of whether Sims was working in concert with state actors so as to render summary judgment on this issue inappropriate. The Court declines to address whether qualified immunity would apply in this instance because, as described in Section C below, Plaintiff cannot sustain his malicious prosecution claim against Sims for other reasons.

### B.  *Monell* Liability and Defendant Board of Education

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior." Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  It has long been established that a municipality cannot be held vicariously liable under § 1983 unless the "execution of the government's policy or custom . . . inflicts the injury."  *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Thus, *Monell* dictates that any § 1983 claim against a municipal entity must be premised on the theory that the municipal actor's allegedly unconstitutional "acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see generally Monell*, 436 U.S. at 692-94.

Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipal entity. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing

the misbehaving officer." *Id*. (citation omitted). Second, the plaintiff must establish a "'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Hayes v. Cnty. of Sullivan*, 853 F.Supp.2d 400, 439 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

> To satisfy the first requirement, a plaintiff must allege the existence of:
>
> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F.Supp.2d 261, 276–77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases). A plaintiff is not required to identify an express rule or regulation in order to establish a *Monell* claim, and a court may infer a municipal policy from acts or omissions of the municipality's policy makers, but in the absence of other evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury." *Sarus v. Rotundo*, 831 F.2d 397, 402-03 (2d Cir. 1987); *see also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125 (1988) (plurality opinion) (explaining that only municipal officials with "final policymaking authority" concerning particular activities giving rise to plaintiff's claims "may by their actions subject the government to § 1983 liability" (citation omitted)). "In the end, therefore, a plaintiff

must demonstrate that, through its deliberate conduct, the municipality was the moving force

behind the alleged injury." *Hayes*, 853 F.Supp.2d at 439 (quoting *Roe v. City of Waterbury*, 542

F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

 Plaintiff has not alleged any formal policy adopted by the Board or any widespread

custom that could subject the Board to *Monell* liability. Plaintiff instead submits that actions

taken by the Board and its agents, in conjunction with decisions made by the Board, suffice to

show the existence of a municipal policy that caused the alleged violation of Plaintiff's civil

rights. Specifically, Watson alleges that the District "authorized its business manager and lawyer

to convey a one-sided and malicious picture to prosecutors," following "the Board's vote to refer

the Watson matter to the DA's office . . . [and] Merritt's phone call [with Sims and Shaw] to

Watson in which he disclosed that Bogle had contacted the DA's office." (Pl.'s Mem. Opp'n

Defs.' Mot. Summ. J. at 50.) Plaintiff has also alleged that misconduct by Sims and Baker, but

"there are no facts plausibly suggesting that the District's hired counsel or business manager had

final policymaking authority for the Defendant Board." *Watson v. Grady*, No. 09 Civ. 3055,

2010 WL 3835047, at *11 (S.D.N.Y. Sept. 30, 2010), ECF No. 49.

 In order to hold a municipality liable for a subordinate's actions—in this case, the actions

of Baker and Sims—authorized policymakers must approve a subordinate's decision and the

basis for it. *Prapotnik*, 485 U.S. at 130. Defendant Baker testified that he had no recollection of

communicating with the Board regarding his meetings with the DA or any information that he

provided to that office. (Def. Ex. 24 at 512-13; Def. Ex. 29 at 125-26.) Plaintiff points to Staino's

testimony that Sims kept the Board apprised of her activities and told Board members that

various people were being called to the DA's Office. (Sussman 56.1 Aff. Ex. 45 at 127.) No

reasonable jury could find that the Board ratified unlawful behavior based simply on the fact that

24

its members were kept apprised of what their lawyer was doing and what she knew about the investigation; Sims was the Board's counsel and her client instructed her to cooperate with the investigation. Plaintiff also states that the Board "conferred whistleblower status" upon Baker to protect him for disclosures to the DA. (Watson 56.1 Board Response ¶ 45.) While there is a mention of Baker being a "whistleblower" in notes taken during a meeting between the Comptroller's Office representatives and the DA's Office, Plaintiff has pointed to no evidence that the Board "conferred" this status on him; ADA Whitesell even denied calling Baker a whistleblower, and the notes were written by Bankowski from the Comptroller's Office, not Whitesell. (*See* Sussman 56.1 Aff. Ex. 1 at 1; Sussman 56.1 Aff. Ex. 4 at 34-35.) The only evidence Plaintiff points to that might support his contention that a reasonable jury could find that the Board ratified or approved wrongful behavior on the part of Baker and Sims is his own allegation that the Board adopted "a resolution to refer matters involving Watson to the district attorney for his possible prosecution." (Watson 56.1 Counter-Statement ¶ 443.) But the wording of the resolution passed by the Board and relied on by Plaintiff does not support Plaintiff's claims. The resolution authorizes the Board's attorneys "to cooperate and release information otherwise protected by the attorney-client privilege to the Dutchess County District Attorney's Office regarding matters specified as being under investigation, to the extent permissible pursuant to policy, contract, and law." (Def. Ex. 112 at 2.) The Board further resolved that it would "suspend[] relevant Board Policy and also waive[] Executive Session confidentiality so as to permit the Board and its members to voluntarily and informally cooperate with the Dutchess County District Attorney's Office with regard to matters specified as being under investigation to the extent permissible pursuant to contract and law." (Def. Ex. 112 at 2.) There is nothing in the resolution that the Board passed that authorizes Baker and Sims "to convey a one-sided and

25

malicious picture to prosecutors," as Plaintiff alleges, or supports that "the Watson matter" was being "referred" to the DA's Office. The evidence demonstrates that there was already a pending criminal investigation so there was nothing to "refer," and the Board's resolution simply does not support Plaintiff's reading of it.

This leaves only Plaintiff's unsupported allegation that he was told that Bogle had contacted the DA's Office. Defendant denies that Bogle was in contact with the DA's Office in 2005 or 2006 regarding Watson or the School District, and denies any contact with anyone at the DA's Office while she was a Board member following the vote on the Separation Agreement. (Board 56.1 Statement ¶ 39; Def. Ex. 28 at 16, 19; Moore Aff. Ex. D, Aff. of Carol A. Bogle Aff. ¶ 7.) Notwithstanding any evidentiary admissibility issues raised concerning Plaintiff's proffered evidence, Plaintiff alleges Bogle spoke with DA Grady, and that he was told this had occurred, but points to no evidence regarding what was discussed, or whether Bogle was acting at the behest of the Board, as opposed to on her own behalf. (Watson Baker Response Aff. ¶ 10.) Watson himself concedes he was provided no details and did not know whether the meeting had occurred before or after the severance agreement. (Watson Baker Response Aff. ¶ 10.) While there may exist a factual dispute regarding whether the contact occurred, there is no basis upon which a reasonable jury could find that the Board authorized a malicious prosecution of Watson based simply on the fact that a single Board member, with no policymaking authority of her own, spoke with the DA on an unknown topic.

Plaintiff has simply failed to meet his burden of pointing to evidence that could lead a reasonable jury to find the existence of a municipal policy or custom that caused a deprivation of his constitutional rights. Thus, summary judgment in favor of the Defendant Board is appropriate.

* * *

Regardless of the Court's decision on these threshold issues, however, the Plaintiff's malicious prosecution claim still fails as to all parties, as Plaintiff has not shown that there remain genuine disputes regarding material facts such that his claim should go before a jury.

### C.  Section 1983 Malicious Prosecution Claims

A § 1983 claim sounding in malicious prosecution seeks to vindicate the Fourth Amendment's protections against unlawful seizure. *See Albright v. Oliver*, 510 U.S. 266, 271-74 (1994); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) ("[T]he Fourth Amendment is the proper source of constitutional protection for claims, such as malicious prosecution, that implicate a person's liberty interest in respect of criminal prosecutions . . . .").

Malicious prosecution claims brought under § 1983 "require[] the plaintiff to 'demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty.'" *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 226 (E.D.N.Y. 2010) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)). Under New York law, in order to establish a malicious prosecution claim, "a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff [by the defendant]; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted); *see also Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 198 (2d Cir. 2014); *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010); *Rothstein v. Carriere*, 375 F.3d 275, 282 (2d Cir. 2004); *accord Savino*, 331 F.2d at 72.

##### *1. Proceeding Terminated in Plaintiff's Favor*

In this matter, the fact that the proceeding terminated in Plaintiff's favor is undisputed, as Plaintiff was acquitted of all charges against him after a non-jury trial.

##### *2. Probable Cause*

Probable cause is a complete defense to any action for malicious prosecution in New York. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010). "Once a suspect has been indicted . . . the law holds that the Grand Jury action creates a presumption of probable cause." *Colon v. City of New York*, 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248; *see Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).  "An indictment fair upon its face, and returned by a properly constituted grand jury, . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged." *Kaley v. United States*, 134 S. Ct. 1090, 1097 (2014) (internal quotation marks omitted).

The presumption created by a grand jury indictment can only be rebutted by evidence that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Colon*, 60 N.Y.2d at 82-83 (holding presumption may be overcome "only by evidence establishing that the police witnesses have not made a complete and full statement of the facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith"); *see also Manganiello*, 612 F.3d at 162; *Savino*, 331 F.3d at 69; *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). False testimony in the grand jury proceedings is generally insufficient to overcome the presumption of probable cause; there must be a demonstration of bad faith—more than mere inconsistencies in the testimony—in order to defeat the grand jury presumption. *McClellan*, 439 F.3d at 146 (citing as examples of bad faith, *inter alia*,

intoxication, conflict of interest, pressuring prosecutor to make deal with putative witness, and altering one's testimony). "Stated differently, in order to overcome the presumption of probable cause arising from a grand jury's indictment, a Plaintiff, who bears the burden of rebutting this presumption, must adduce sufficient evidence to 'erode the premise that the Grand Jury acted judicially.'" *Jovanovic v. City of New York*, No. 04 Civ. 8437, 2010 WL 8500283, at *6 (S.D.N.Y. Sept. 28, 2010) (quoting *Rothstein*, 373 F.3d at 284) (internal citations and alterations omitted). It is insufficient to show or allege that a defendant provided false information outside of the grand jury; in order to overcome the presumption of probable cause created by a grand jury indictment, a plaintiff is "required to rebut that presumption by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*." *Rothstein*, 373 F.3d at 283 (emphasis added).

"[W]here a plaintiff's only evidence to rebut the presumption of the indictment is his version of events, courts will find such evidence to be nothing more than mere conjecture and surmise that the plaintiff's indictment was procured as a result of conduct undertaken by the defendants in bad faith, which is insufficient to rebut the presumption of probable cause." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted); *see also Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) (quoting *Brandon*, 705 F. Supp. 2d at 273); *Reid v. City of New York*, No. 00 Civ. 5164, 2004 WL 626228, at *7 (S.D.N.Y. Mar. 29, 2004); *Irish v. City of New York*, No. 09 Civ. 5568, 2010 WL 5065896, at *4 (citing *Hall v. Brown*, 489 F. Supp. 2d 166, 173 (N.D.N.Y. 2007) ("Plaintiff cannot bootstrap mere inconsistencies in testimony to such a high standard of bad faith by baldly asserting the presence of [perjury] that has no basis in the record."); *Hall*, 489 F. Supp. 2d at 173 (noting that a "bald assertion of a fraudulent scheme that finds no support in the

record is, without more, insufficient to raise a triable issue of fact as to whether Defendants harbored any bad-faith motive to prosecute [Plaintiff].").

The Second Circuit set forth a "competing testimony plus" standard in *Boyd* to assess whether a plaintiff has sufficiently rebutted the presumption of probable cause. *Boyd*, 336 F.3d at 77; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2010). In *Boyd*, the testimony of the plaintiff and defendants differed on the key issue of whether the plaintiff had made incriminating statements before or after he was arrested. The Second Circuit, in finding that the plaintiff had satisfied his burden of raising a question of fact as to the existence of probable cause, looked to the police officer's memo book, which seemed to corroborate the plaintiff's version of events. *Boyd*, 336 F.3d at 77. This corroboration of the plaintiff's testimony—the "plus factor"—coupled with the requirement that the court draw all reasonable inferences in favor of plaintiff as the non-moving party led the appellate court to hold that a jury could reasonably find that the indictment was secured through bad faith or perjury, and thus that there had been malicious prosecution of the plaintiff. *Id.*; *see also* McClellan, 439 F.3d at 146 (relying on *Boyd* to reverse summary judgment grant due to defendant officer's varying versions of events leading to arrest of plaintiff and plaintiff's evidence suggesting bad faith on defendant's part).

Here, Plaintiff contends that a reasonable jury could find from the record that probable cause to prosecute Watson was lacking. He repeatedly alleges that Baker, Sims, and Board members made false statements before and during the grand jury proceedings. The Court is thus faced with competing versions of the events testified to by these parties, as set forth by Watson on the one side and Defendants on the other. None of the defendants have admitted to testifying falsely, nor have there been any clear findings that they did so; for example, there have been no

prosecutions for perjury, such as had occurred in *Coggins*. *See Coggins v. Buonora*, 776 F.3d 108, 110 (2d Cir. 2015). Because Watson's own version of events, standing alone, is not sufficient to overcome the presumption of probable cause, the Court must look to whether his version of what occurred is corroborated by any other evidence.

Plaintiff relies mainly on his own personal recollections, set forth in his various affidavits submitted in opposition to the instant motion, to show that the information given to the DA's Office and the grand jury by the Defendants was false or perjured. Much of the documentary evidence that supports Plaintiff's version of events consists of his own notes and objections regarding the audits, but Watson's objections to the audit are simply his own version of events— they do not provide any additional corroboration that would help him to overcome the probable cause presumption under the "competing testimony plus test."

Plaintiff also attempts to use the deposition testimony of several witnesses, including the defendants, to tease out inconsistencies between their later testimony and what was allegedly reported to the DA's Office during the investigation into Watson and the Board. These "inconsistencies,"[10] however, either do not appear to relate to the substance of the actual grand jury testimony or to indicate that any inconsistent testimony was offered *in bad faith*, such that they would rebut the presumption of probable cause. *See Waddlington v. City of New York*, 971 F. Supp. 2d 286, 295 (E.D.N.Y. 2013) ("[A]side from his own bald assertions, Plaintiff provides no evidence that [Defendants] offered inconsistent testimony *in bad faith* and the mere existence of inconsistent testimony is generally, without more, insufficient to overcome the presumption of probable cause created by a grand jury's indictment." (emphasis added)). Additionally, many of

---

[10] Indeed, several instances of what Plaintiff tries to paint as lies and inconsistencies appears to simply consist of people stating at their depositions that they did not recall statements they supposedly made to the DA's Office and auditors, or that they did not recall knowing certain information they had allegedly conveyed to the DA and/or auditors.

the inconsistencies cited by Plaintiff involve information not relevant to the grand jury inquiry or alleged misconduct that Watson was never prosecuted for, and thus is not material to the question of probable cause. *See Hathaway v. County of Essex*, 995 F. Supp. 62, 69 (N.D.N.Y.1998) ("Reliance on variations in testimony . . . as evidence of fraud, suppression of evidence, or perjury [is] insufficient to overcome the presumption of probable cause.").

Many of the key events or actions that the grand jury indictment rests on are supported by testimony from multiple witnesses and largely supported by documents. For example, Count One of the indictment is partly based on Plaintiff's alleged misrepresentations to the Board regarding payments to the Palombo Group. Plaintiff contends that he never told the Board at the October 11, 2005, board meeting that Gary McGrath, the District's Director of Facilities, had reviewed the Palombo Group's submissions and approved payment for the work. (Pl.'s Aff. in Resp. to Sims Mot. Summ. J. ¶ 19.) Sims testified at the grand jury that Plaintiff represented to the Board that McGrath had reviewed and approved the work done by the Palombo Group and that the Board approved the payment, relying on Watson's representation. (Def. Ex. 1 at 1286-87 ("I recommended that [the Superintendent] get that type of review done by Gary McGrath, and what the Superintendent told them that night was 'I did that. Mr. McGrath has reviewed this binder and he believes it appropriate for payment, that the work was done,' and that Board just relied on it.").) Merritt also testified similarly. (Def. Ex. 1 at 1039 ("Q: He [the Superintendent] also said the facilities manager looked at the charges and approved it? A: Correct.").) Plaintiff has failed to offer any evidence, other than his own version of events, to show that the evidence presented before the grand jury was fraudulent or perjurious.[11] The same is true regarding the rest of the

---

[11] Plaintiff submitted a document that appears to set forth grand jury testimony by Beth Sims that Plaintiff alleges was "false and fabricated." (*See* Watson Sims Response Aff. Ex. 11.) The document consists of line-by-line citations with headings that state "Sims' false allegations regarding [subject]," and appear to relate to Sims's testimony to the grand jury regarding various subjects. Plaintiff fails to authenticate this document or explain what it is. Without any

evidence presented on the other aspects of the indictment. *Cf. Hill v. Melvin*, No. 05 Civ. 6645, 2006 WL 1749520, at *14-15 (S.D.N.Y. June 27, 2006) ("Conflicting testimony between the (civil) plaintiff and defendants is not sufficient to rebut the presumption of probable cause. . . . After a grand jury indictment, the case law for malicious prosecution sets a higher standard, which cannot be met by speculation or self-serving statements."); *see also Colon*, 60 N.Y.2d at 83. ("Nor do variations in the witnesses' testimony prove perjury. Rather, they appear to indicate only the witnesses' differing perceptions of the incidents they observed.").

Plaintiff, in conclusory fashion, asserts that testimony before the grand jury was false, documents were fabricated, and Defendants lied to the DA, yet he points to no actual evidence of falsity, other than his own competing version of events (or sometimes nothing at all). He repeatedly alleges in his submissions that certain documents were falsified and then simply cites to the documents themselves, as if merely reviewing the documents in question would reveal that they were fraudulent or fabricated. For example, Plaintiff alleges that "[a]fter the DA commenced its investigation, Sims fabricated two documents which made baseless and false statements about the Palombo matter." (Watson 56.1 Counter-Statement ¶ 182.) Plaintiff cites to Exhibits 24 and 25, the very documents that he claims were fabricated, as support for his contention, without pointing to evidence that contradicts their contents or any indicia to demonstrate they were fabricated. Plaintiff's repetitive assertions of falsity and fabrication without more is insufficient to overcome the presumption of probable cause. (*See, e.g.*, Watson 56.1 Counter-Statement ¶¶ 44, 125, 184, 188-191, 193, 195, 197.) Many of these statements are improperly argumentative, speculative, and/or attempt to set forth legal conclusions in the guise

---

description of the document's provenance or any authentication of its contents, the Court is unable to determine its admissibility (or lack thereof) and it appears to be nothing more than a made-for-litigation document. Even if this document were found to be admissible, it does not provide corroboration for Plaintiff's version of events; it merely sets forth the portions of Sims's testimony that he alleges were false and/or fabricated.

of factual statements. (*See, e.g.*, Watson 56.1 Counter-Statement ¶¶ 272, 276-77, 321.) Thus, "[t]he record is barren of evidence (as opposed to conclusory allegations) to overcome the presumption created by the indictment. [Plaintiff] asserts that [the defendants] perjured [themselves], but that conclusory allegation is insufficient to overcome this strong presumption." *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 422 (S.D.N.Y. 2002)).

Plaintiff's argument, distilled to its core, appears to be essentially that his indictment stemmed from misinformation and one-sided representations to the DA and to the grand jury by Defendants, and that probable cause was lacking because these witnesses lied and provided a skewed picture. (*See, e.g.*, Watson Counter-Statement Aff. ¶ 5 ("Much of what was presented to the Grand Jury and at the criminal trial were half-truths which those testified, specifically, the defendants herein simply failed to provide to the prosecutor.").) But it is also clear from the evidence submitted on the instant motions that Watson's own account of what transpired was known to the DA and to the various auditors. (Def. Ex. 22 at 101-04; Def. Ex. 77; Def. Ex. 121.) Plaintiff submitted his objections to the Cooper Niemann audit, and was interviewed by Bankowski. (*See* Def. Ex. 77; Def. Ex. 121.) Defendants, citing to ADA Whitesell's deposition testimony, also set forth as undisputed that Watson's objections to the Cooper Niemann audit were known to the DA's Office and that Watson was given the opportunity to testify at the grand jury as to his side of the story but chose not to. (Sims 56.1 Statement ¶ 133; Board 56.1 Statement ¶ 90.) Other documentary evidence supports this contention, including correspondence between ADA Whitesell and Plaintiff's counsel in which Whitesell informed Plaintiff of the grand jury's interest in hearing from Watson and counsel's responses to the request for information regarding matters of interest to the grand jury. (*See* Def. Ex. 79; Def. Ex. 80.) Thus, it is clear that the DA's Office was informed of Watson's version, and still made an independent

decision to seek an indictment. This evidence, and Plaintiff's failure to proffer admissible evidence to the contrary, significantly undercuts Watson's assertion that probable cause did not exist.

Defendants additionally argue that their grand jury testimony, even if it were false, could not be used against them in this case because of the Supreme Court's decision in *Rehberg*, which held that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony." *Rehberg v. Paulk*, 566 U.S. __, 132 S. Ct. 1497, 1499 (2012). Plaintiff argues that the Second Circuit's decision in *Marshall v. Randall*, in which the Court held that the use of a defendant's grand jury testimony for impeachment purposes did not run afoul of *Rehberg*, *see* 719 F.3d 113, 116 (2d Cir. 2013), makes it clear that *Rehberg* does not preclude all use of a defendant's grand jury testimony by a plaintiff to prove a § 1983 malicious prosecution claim and that this Court should permit the use of Defendants' grand jury testimony to rebut the presumption of probable cause. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 36-37.) Plaintiff does not cite to any direct authority for this proposition, but analogizes such use to the use of grand jury testimony in *Marshall*, arguing that this use does not cause a plaintiff's claim to be "based on" the testimony "so long as the predicate conduct for the plaintiff's claim is something other than the grand jury testimony." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 37.)

A clear distinction can be made between the instant case and *Marshall*. In *Marshall*, the grand jury testimony was used for impeachment purposes, which meant that its use went solely to the question of witness credibility at trial. Plaintiff, however, seeks to prove that probable cause was lacking—one element of the very claim that he is asserting against defendants—by relying on defendants' grand jury testimony to show fraud, perjury, or other sufficiently serious misconduct to erode the premise that the Grand Jury acted judicially. Even though Plaintiff

35

asserts that his claim is based on predicate conduct other than Defendants' testimony, his attempt to use their grand jury testimony to prove *an essential element of his claim* would render his claim "based on" their testimony, as that term is used in *Rehberg*.

Plaintiff also cites to the Second Circuit's recent decision in *Coggins* to support his contention that he can sustain a malicious prosecution claim based on Defendants' alleged conduct that occurred before the grand jury investigation was convened. *See Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015). In *Coggins*, two police officers testified falsely at a grand jury and the plaintiff was charged with resisting arrest and criminal possession of a weapon. In addition to making false statements to the DA and testifying falsely before the grand jury, the officers also alleged falsified documents and conspired with each other to present their false version of events to the prosecutors. *Id*. at 110-11. When this was discovered, the DA dismissed the charges against the plaintiff and one of the officers was indicted for, and eventually pled guilty, perjury. *Id*. at 110. In the civil case, the two police officers moved to dismiss the plaintiff's malicious prosecution claim on the ground that they were entitled to absolute immunity under *Rehberg*. *Id*. at 111. On appeal, the Second Circuit held that *Rehberg* does not absolutely immunize grand jury witnesses from malicious prosecution claims to the extent these claims are based on conduct other than their grand jury testimony. *Id*. at 113.

Plaintiff misses a crucial distinction between the instant case and *Coggins*. Probable cause was clearly lacking in *Coggins* because the officer who testified at the grand jury was indicted and pled guilty to perjury. A witness's conviction for perjury based on his false testimony before the grand jury provides a conclusive rebuttal of the presumption of probable cause, thus allowing Coggins's claim to withstand the officers' motion to dismiss. While it would appear that Watson could base a malicious prosecution claim on Defendants' conduct

36

prior to the grand jury under *Coggins*, as he argues, he still cannot do so without rebutting the presumption of probable cause created by his indictment by the grand jury and he has failed to meet his burden on this element. Unlike Coggins, there is no finding that the remaining defendants in this action provided perjured testimony before the grand jury.

> 3. *Remaining Elements: Initiation of Proceeding and Malice*

Defendants have carried their preliminary burden of presenting evidence that establishes the existence of probable cause, including the grand jury indictment. Plaintiff has failed to raise the existence of a genuine issue of material fact that would overcome the presumption of probable cause arising from the grand jury indictment. The Court thus declines to reach the question of whether there remain any disputed material facts regarding the other two elements of a malicious prosecution claim—whether the defendants initiated the proceedings and whether they acted out of malice. The inquiry ends here because Plaintiff's inability to establish the lack of probable cause warrants dismissal of his malicious prosecution claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Baker's motion for summary judgment is granted; Defendant Sims's motion for summary judgment is granted; and Defendant Board of Education's motion for summary judgment is granted. The Clerk of the Court is respectfully directed to terminate the motions at Docket Nos. 103, 112, and 133, and to terminate this case.

Dated:   may 7th 2015                                    SO ORDERED:
         White Plains, New York

                                                     _____
                                                        NELSON S. ROMÁN
                                                        United States District Judge